## TEXAS & PACIFIC MOTOR TRANSPORT CO. v. UNITED STATES et al.

### Civ. No. 3696.

United States District Court
N. D. Texas, Dallas Division.

Nov. 16, 1949.

J. T. Suggs, D. L. Case, Robert Thompson, William R. McDowell, John C. Robertson, J. L. Lancaster, Jr., W. O. Reed, Claude Williams, all of Dallas, Tex., for petitioner.

H. L. Underwood, Assistant Chief Counsel, Interstate Commerce Commission, Daniel W. Knowlton, Chief Counsel, Interstate Commerce Commission, Washington, D. C., Frank B. Potter, United States Attorney, Fort Worth Tex., O. M. Harrell, Assistant United States Attorney, Dallas, Tex., for the United States.

E. J. Hickey, Jr., Washington, D. C., Harmon L. Watkins, Dallas, Texas, of counsel, Mulholland, Robie, McEwen & Hickey, Washington, D. C., for Railway Labor Executives Ass'n, Intervenor.

Callaway & Reed, Dallas, Tex., for Regular Common Carrier Conference of American Trucking Associations, Inc., Intervenor.

Before HOLMES, Circuit Judge, and DAWKINS and ATWELL, District Judges.

ATWELL, District Judge.

The petitioner, hereafter known as "Transport," is a corporation with its stock wholly owned by the Texas and Pacific Railway Company.

The Texas and Pacific Railway Company, hereinafter designated "Railway," is a corporation created by virtue of an Act of Congress.

Transport is authorized to engage in the business of a common carrier by motor vehicle, or, by any means whatsoever, and partly by one means and partly by another, and by arrangement, or contract with other common carriers. It may lease, contract with, or, otherwise deal in truck, bus, stage, or, other transportation systems.

It has carried on this business for many years, subject to the provisions of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq. Such activity has been both interstate and intrastate, in the states of Texas, Louisiana, and New Mexico. Its intrastate business has been under common carriers' certificates issued by the respective states of Texas and Louisiana. It does not operate intrastate in the state of New Mexico. It has engaged in interstate business in Texas, New Mexico and Louisiana under certificates required by purchase and original application which were issued by the Interstate Commerce Commission, from time to time.

After the acquisition of authorization to so engage, it invested large sums of money therein. It claims that the cost of certificates authorized by the Commission, amounted to $96,674.18. That in addition to this cost, it has invested heavily in equipment, and transportation facilities for the proper maintenance and prosecution of this business to the extent of $270,257.80. That it is earning gross revenues in interstate transportation in the approximate sum of $20,000 per month, and approximately $150,000 per month from intrastate operation.

That the purpose of its organization, in 1929, was to haul less-than-carload freight shipments, known in its petition as "merchandise traffic," to, from and between stations on the line of Railway. That its schedule of rates on such traffic between such local stations was the same as that maintained by Railway, and in that year it published station-to-station rates on said merchandise, which were served by Railway, corresponding to those of motor carriers, which rates included pick-up and delivery service. It issued bills of lading in its own name, but the transportation, except for local pick-up and delivery serv-ice was performed by Railway under arrangements between it and Transport.

In November, 1935, Transport negotiated common carrier-over-road operations between Monahans, Texas and Lovington, New Mexico.

In 1935 it secured authority from the Commission to purchase certificates of convenience and necessity from other common motor carriers, which had been established prior to the Motor Carrier Act of 1935, 49 U.S.C.A. § 301 et seq., and commonly known as "grandfather rights."

It also purchased the same sort of rights from W. A. Johnson, Johnson Motor Lines, and the Fort Worth Warehouse and Storage Company. These all related to motor carriers along the line between Dallas and Abilene and Big Spring, Texas.

In 1937 it purchased from the Southern Transportation Lines common carrier and grandfather rights between Dallas and Wills Point, and Gladewater, Texas and Shreveport, Louisiana. That along the routes of these certificates are such important distribution centers, shipping points, designations and gateways as Dallas, Fort Worth, Abilene, Sweetwater and Big Spring, Texas and Shreveport, Louisiana. That all of the interstate traffic handled by Transport either originates in or terminates on, or, moves over such routes. These certificates were validly issued under Sec. 207 of the Motor Carrier Act of 1935 and Part 2 of the Interstate Commerce Act of 1940, 49 U.S.C.A. § 307 and § 301 et seq.

That such original and purchased certificates had no such conditions attached to them by the Commission as the Commission determined in its orders of January 22, 1948, and May 2, 1949. Such orders, Transport claims, ingraft on the certificates which it owns, certain conditions which destroy, or, materially diminish the common carrier character of such rights and constitutes a taking of private property for a public purpose without just compensation contrary to the 5th Amendment.

It also claims that it had no notice of a hearing, such as is required, for such action, and, that no appropriate testimony was had by the Commission to substantiate its find-

ings. That it will suffer irreparable damage if such orders are not restrained and that its loss will be approximately $240,000 per year, and, in addition, would deprive Transport of the value of its investments in the certificates aggregating $96,674.18, as well as of its physical property devoted to interstate transportation in the sum of $25,000. That its business in 1948 accorded it a net operating profit, before taxes, of $118,808.06, and a net profit of $69,959.41.

It denies that it has any complete remedy at law which is speedy and adequate. It asks for temporary restraint and for the impanelling of a three-judge court, and, a permanent injunction.

Attached to the petition are informative schedules, "A", "B", and "C". "A" being a report of hearings; "B" showing certificates, and "C" showing a map of Transport's and Railway's system.

The answer of the Commission concedes jurisdiction and admits the purpose of the suit. It admits the acquisition of the certificates, and that Transport has conducted operations in interstate commerce by virtue of the same, but, it contends that the certificates contained restrictions in respect "to operations or other matters." It does not answer as to operations by Transport before Motor Carrier Act. It denies that the certificates purchased granted "grandfather rights," and claims that they were limited to operations "auxiliary to, or, supplementary of, rail carrier service." It admits the orders and reports pleaded, and that they are the best evidence of its findings, conclusions and requirements. It denies that any such orders, or, requirements are arbitrary, or, the reversal of former policy with respect to the operation authority granted to Transport. It denies that such orders are unlawful. It denies that Transport will suffer irreparable damage unless its orders of January 22, 1948 and May 9th, 1949, are set aside.

The answer, therefore, makes an issue, upon which testimony was considered appropriate, with reference to investment; carrying on the business before Motor Carrier Act; as to whether the certificates were conditioned "auxiliary to, or, supplemental of said carrier services;" damages; notice of hearing and a proper hearing.

Upon these controverted issues the testimony discloses that the allegations as to the controverted issues, made in the petitioner's complaint, are entirely supported by the testimony.

As to a hearing there appear cross currents in Railroad Comm. of State of California v. Pacific Gas & Electric Co., 302 U.S. 388, 58 S.Ct. 334, 82 L.Ed. 319, spoken of a little later, and, State of New York v. U. S., 331 U.S. 284, 334-336, 67 S.Ct. 1207, 91 L.Ed. 1492, cited by Railway, as to the inability of this court to have a hearing on this question. 331 U.S. treated only the rate, not the question of a hearing in the constitutional sense.

The defendant, in some of the exhibits, and in its own pleadings, and particularly in its report on the "further hearing by Div. 5," seems to think, and so expressed the thought that Transport's line of service, though justly and reasonably and legally authorized by both state and nation, was too long, and that it made one system. We may appropriately ask, may such a line, 1150 miles long, validly acquired from time to time, be summarily broken into parts, and its independence destroyed? Does the Act justify such destruction?

The wisdom of Congress is displayed in the addition to the Motor Carrier Act which permitted such a service to be organized by and for the service of the Railroad. The main purpose of the supervision by Commission is to save the shipping public from the charge of exorbitant rates, and the nuisance of a monopolizing combination.

The rates charged, and filed by Transport were in complete accord with other motor carriers. Highly satisfactory to such shippers and receivers of freight as are represented by the Chambers of Commerce in Dallas and Fort Worth as, evidenced by their respective spokesmen.

This is not to say that the granting of a certificate places the holder thereof beyond the power of the Commission to supervise and to continue to inspect its service. But, it is to say that the holder

of the certificate must be recognized as the holder of property and that such property may not be taken from it without due process and with an arbitrary or unreasonable motive.

The Supreme court in Railroad Commission of State of California v. Pacific Gas & Electric Co., 302 U.S. 388, 58 S.Ct. 334, 82 L.Ed. 319, treated this question at considerable length, and stated that the utility had the right to a fair and open hearing, as one of the rudiments of fair play assured to every litigant by the federal Constitution.

If rates, said the court in that case, are confiscatory, then the jurisdiction of the Commission is at once appropriately invoked. Courts do not have a right to question the correctness of the method, or, reasoning adopted by a regulating agency, but the court does have a right to determine whether, or, not the rate will result in confiscation.

The soul of the controversy here, is the result that the order has. There is no debate here over the question of inappropriate charges, or, tariff rates, or, combinations, or, monopolies. The question here in the breaking up of a system that has been validly acquired, for a legal purpose, and which will result in confiscation, and, irreparable damage to the complaining carrier.

There are countless other decisions, impinging upon the theories that are involved in this interesting controversy, such as: I. C. C. v. Parker, 326 U.S. 60, 65 S.Ct. 1490, 89 L.Ed. 2051; U. S. v. Detroit & Cleveland Navigation Co., 326 U.S. 236, 66 S.Ct. 75, 90 L.Ed. 38; State of New York v. United States, 331 U.S. 334, 67 S.Ct. 1207, 91 L.Ed. 1492; Chesapeake & O. R. Co., & O. v. U. S., 283 U.S. 35, 51 S.Ct. 337, 75 L.Ed. 824; U. S. v. Pierce Auto Freight Lines, 327 U.S. 515, 66 S. Ct. 687, 90 L.Ed. 821; I. C. C. v. Illinois Central, R. Co., 215 U.S. 452, 30 S.Ct. 155, 54 L.Ed. 280; U. S. v. Caroline Freight Carriers Corp., 315 U.S. 475, 62 S.Ct. 722, 86 L.Ed. 971; Crichton v. U. S., D.C., 56 F.Supp. 876; Id., 323 U.S. 684, 65 S.Ct. 559, 89 L.Ed. 554; Crescent Express Lines v. U. S., D.C., 49 F.Supp. 92; Truax v. Corrigan, 257 U.S. 312, 42 S.Ct. 124, 66 L.Ed. 254, 27 A.L.R. 375; U. S. v. Louisiana & P. R. Co., 234 U.S. 1, 34 S.Ct. 741, 58 L.Ed. 1185.

In point, U. S. v. Seatrain Lines, 329 U.S. 424, 67 S.Ct. 435, 91 L.Ed. 396, affirming D.C., 64 F.Supp. 156. The Oakley C. Curtis, 2 Cir., 4 F.2d 979; Boulevard Transit Lines, v. U. S., D.C., 77 F.Supp. 594; Sec. 212(a) of the Act, 49 U.S.C.A. § 312(a), 54 Stat. 899, Act 1940, Consolidated Lines, Railway and motor.

In I. C. C. v. Parker, 326 U.S. 60, 65 S.Ct. 1490, 1494, 89 L.Ed. 2051, the contest was between the Commission and motor carrier Parker, growing out of the Commission having given to Willett certain motor carrier privileges along the line of the Pennsylvania Lines in Ohio, Indiana and Illinois.

Mr. Justice Reed pointed out, for the court, the necessity for the certificates to Parker and explained that this necessity arose out of the desire to have a "common management of railroad and trucks, * * * [for] better cooperation than would be obtained by arm's-length contracts or agreements."

The evidence in that case showed there were operating truck lines which individually could serve all the way-stations. He also said that, "We think that it was for a motor service to improve an existing rail service * * * [and] that the Commission had statutory authority and administrative discretion to order the certificate to issue."

In a succeeding paragraph the Justice pointed out a necessity for closer cooperation between the rail carriers and the motor carriers. 326 U.S. pages 68-70, 65 S.Ct. pages 1494, 1495.

At page 71 of 326 U.S., at page 1495 of 65 S.Ct. his reasoning goes further and at the top of page 72 of 326 U.S., at page 1496 of 65 S.Ct. it is fully harvested.

He also declares, 326 U.S. on page 73, 65 S.Ct. on page 1497, "There is no prohibition [as to a railway acquiring truck lines] in terms. Any such implication is negated by the discretion to grant cer-

tificates conferred on the Commission by the Act."

Mr. Justice Douglas, in his dissenting opinion in which Justices Black and Rutledge joined, make this position of the court so clear that one cannot escape.

Now, the very simple academic thought arises, what, in view of the reasoning of the Supreme court, in the case just spoken of, does "auxiliary and supplemental to," continually used by the Commission in the present case, mean? And, by what authority does the Commission read it into the certificates issued to the plaintiff?

The reasoning of the court in the Parker case shows that the very action of the Commission, under the Act, was for the purpose of being "supplemental and auxiliary" of the railroad carrier.

The facts here show that the railroad carrier owns all the stock in Transport, and, with that ownership, we must concede, engineered the ultimate securing of the complete 1150 miles covered by Transport, which, nearly all of the way, was, "auxiliary to and supplemental of" the Railroad transportation. Transport's line went into New Mexico, as a feeder for the same system.

The dictionary defines "auxiliary," to mean, "helping or aiding; giving support; subsidiary or additional supplementary power. A helper or aid; a confederate; an ally as in war."

Almost as simple, is the definition of the word, "supplemental," which is, "additional; or, have the nature of or forming a supplement"; as, "he had come upon supplementary sources of income."

We, therefore, find that Transport was "auxiliary to and supplemental" of Railway. That is why Railway assisted in its creation. That is why Railway put up the money to buy the stock and to get it in working order.

That leaves two questions:

(a) Is such action monopolizing?

If so, that question was for the determination of the Congress. It authorized, in the general wording of the Motor Act, the consolidation, or, purchase of, motor carriers to assist the railway carrier. That question was not for the court. It could not be a question for the Commission.

(b) The last question is whether, after having permitted the acquisition of these certificates, the Commission may issue orders which stifle, and, in reality, destroy the value of such certificates. No one learned in the law could permit an affirmative answer to that question. It is a taking of private property without due process. It is confiscation. It is destruction.

Glancing once more at the provisions of the statute, we find that Sec. 203(a) (14), defines common carrier by motor vehicle. The attempt by the Commission to restrict the term, "motor carrier," would be an usurpation of power. So, also, there may be no lawful restriction of rates. Neither does Sec. 208(a), while broad, permit a modification of a separate provision of the Act itself. It has been said that Sec. 208(a) means that the Commission shall preserve substantial parity between future and past operations. A valid grant cannot be affected by the addition of an invalid condition.

In truth, conditions and limitations granted under Sec. 208(a) must be reasonable, and they must be required by public convenience and necessity, or, for the purpose of carrying out the requirements established under Sec. 204(a) (1) and (6). Conditions must conform to the requirements of Sec. 208, itself, and must be consistent with and fall within the specific statutes applicable to common motor carriers. Thus, while the Commission might prescribe the points to be served, it could not forbid the participation in joint rates and through routes for the simple reason that such a provision would be inconsistent with the wording of Sec. 216 of the Act.

Nor can revocation be accomplished in any way except under Sec. 212. It cannot be brought about by the imposition of terms and conditions, or, limitations. The Commission, itself, said in Quaker City Bus Co. v. Black Hawk Lines, Inc., that "The existence of a certificate creates a vested

motor carrier status which stays in force and effect * * * until that certificate is revoked in accordance with the procedure prescribed in Sec. 212(a)."

If we give the Commission power to revoke by terms, limitations and conditions, by an attempted stretch of Sec. 208 (a), then we make Sec. 212(a) utterly useless. Each Section has its purpose. Each Section expresses the intent of the Congress. Such intent must govern.

The permanent injunction will issue as prayed, and a judgment in accordance will be drawn and forwarded for signatures.

DAWKINS, District Judge, dissents.