# UNITED STATES ET AL. v. TEXAS & PACIFIC MOTOR TRANSPORT CO.

NO. 38.

Argued November 7–8, 1950.—Decided February 26, 1951.

*Daniel W. Knowlton* argued the cause for the United States and the Interstate Commerce Commission, appellants in No. 38. With him on the brief were *Solicitor General Perlman, Acting Assistant Attorney General Underhill* and *H. L. Underwood.*

*Frank C. Brooks* argued the cause and filed a brief for appellant in No. 39.

*J. T. Suggs* argued the cause for appellee. With him on the brief were *R. Granville Curry, W. O. Reed, Claude Williams, Robert Thompson* and *D. L. Case.*

MR. JUSTICE REED delivered the opinion of the Court.

These appeals, by the Interstate Commerce Commission, and by the intervenor, Regular Common Carrier Conference of American Trucking Associations, Inc., from the judgment of a three-judge federal district court setting aside two orders of the Interstate Commerce Commission, and entering a permanent injunction, raise questions similar to those discussed in No. 25, *United States* v. *Rock Island Motor Transit Co., ante,* p. 419, decided today. The questions relate to the power of the Commission to ban service practices theretofore permitted under certificates of public convenience and necessity previously issued

to a common carrier by motor vehicle. The Commission acted under authority reserved in the certificate to impose additional restrictions to insure that the motor carrier's operations will be auxiliary to or supplemental of the operations of its parent common carrier by rail.

The Texas and Pacific Motor Transport Company is a wholly owned subsidiary of the Texas and Pacific Railway, operating a system of regular routes for the carriage of freight, from New Orleans to El Paso, Texas, and Lovington, New Mexico, roughly paralleling the lines of the railway and its subsidiaries. Transport was organized in 1929 to provide a local pick-up and delivery service in connection with rail transportation between points on the lines of the railway. Its first over-the-road common-carrier operation, between Monahans, Texas, and Lovington, New Mexico, was inaugurated just before the effective date of the Motor Carrier Act of 1935. It extended its operations by obtaining certificates of convenience and necessity from the Commission, both under § 213 of the 1935 Act, now § 5 of the Interstate Commerce Act, providing for acquisition of established rights by purchase from other carriers ("grandfather" rights); and under § 207 of the Interstate Commerce Act, providing for new operations.

Between July 1939 and November 1942, the Commission issued sixteen certificates to Transport, covering various segments of its presently operating routes.[1] In all the certificates the Commission reserved the right to

---

[1] Sixteen proceedings are covered by I. C. C. docket number MC–50544, and various subnumbers, set out in Appendix A to *Texas & Pacific Motor Transport Co. Common Carrier Application,* 47 M. C. C. 753, 764. Transport was also operating under certain temporary authorities, Nos. MC–50544 (Sub-Nos. 21–TA, 24–TA, and 30–TA), which expired before the issuance of the Commission's orders under consideration here.

impose further restrictions in order to confine Transport's operation to service "auxiliary to, or supplemental of, rail service." This condition was expressed in either one of the two forms set out in the margin.[2] In addition, each certificate contained one or more, usually more, further conditions: (1) That the service to be performed was to be "auxiliary to, or supplemental of" the rail service.[3] (2) That only railway station points were to be served.[4] (3) Either that (a) all shipments should be made on a through rail bill of lading, including a prior or subsequent rail movement;[5] or (b) that no shipments should be made between certain "key points" on the rail line, or through

---

[2] "5. Such further specific conditions as we, in the future, may find it necessary to impose in order to restrict applicant's operation to service which is auxiliary to, or supplemental of, rail service.

"5A. The authority herein granted shall be subject to such further limitations or restrictions as the Commission may hereafter find it necessary to impose in order to restrict applicant's operation to service which is auxiliary to, or supplemental of, train service of the railway, and in order to insure that the service rendered shall not unduly restrain competition." 47 M. C. C. 753, 766.

[3] "1. The service to be performed by applicant shall be limited to service which is auxiliary to, or supplemental .of, rail service of the Texas and Pacific Railway, or in certain cases of its subsidiary rail lines, (or of Texas-New Mexico Railway Company) herein called the railway." *Ibid.*

[4] "2. Applicant shall not serve, or interchange traffic at any point not a station on a rail line of the railway." *Ibid.*

[5] "3. Shipments transported by applicant shall be limited to those which it receives from or delivers to the railway under a through bill of lading covering, in addition to movement by applicant, a prior or subsequent movement by rail.

"3A. Shipments transported by applicant shall be limited to those which it receives from or delivers to the railway under a through bill of lading covering in addition to movement by applicant, a prior or subsequent movement by rail, and those which it transports as parts of through shipments prior or subsequent to movement by rail under appropriate transit rules." *Ibid.*

more than one of them.[6]   And (4) that the contractual arrangements between Transport and Railway be subject to modification by the Commission.[7]

The irregular incidence of these conditions in the certificates may be accounted for by the segmentary fashion in which Transport built up its system of routes, over a period of several years.   They were not reconsidered as a group by the Commission until 1943, when, in response to a petition by Transport, to determine what modification should be made in its certificate No. MC–50544 (Sub-No. 11), particularly in regard to service for freight between El Paso and Sierra Blanca, Texas, for the Texas and New Orleans Railroad Company, it reopened nine of the certificate proceedings to consider whether Transport could join with other motor carriers in rates, some of which provided for substituting rail service for motor service. The Commission held that

> "Since petitioner's certificates limit the service to be performed to that which is auxiliary to or supplemental of the rail service of the railway [in some the limitation was by reservation], it is without authority to engage in operations unconnected with the rail service and, accordingly, may not properly be a party to tariffs containing all-motor or joint rates, nor participate in a directory providing for the substitution of train service for motor-vehicle service at its option.

[6] "3B. No shipments shall be transported by applicant as a common carrier by motor vehicle between any of the following points or through, or to, or from more than one of said points: Fort Worth, Tex., and Texarkana, Tex.-Ark.

"3C. No shipments shall be transported by applicant between any of the following points or through, or to, or from more than one of said points: El Paso and Pecos, Tex." *Ibid.*

[7] "4. All contractual arrangements between applicant and the railway shall be reported to us and shall be subject to revision, if and as we find it to be necessary in order that such arrangements shall be fair and suitable to the parties." *Ibid.*

> To the extent petitioner is performing or participating in all-motor movements on the bills of lading of a motor carrier and at all-motor rates, it is performing a motor service in competition with the rail service and the service of existing motor carriers; and, to the extent it is substituting rail service for motor-vehicle service, the rail service is auxiliary to or supplemental of the motor-vehicle service rather than the motor-vehicle service being auxiliary to or supplemental of rail service." [8]

The Commission did not issue any affirmative order, but directed Transport to modify its service in accordance with the findings, within a reasonable time.

Transport and Railway then petitioned jointly for reconsideration, or for further hearings, including hearings on certain other certificates; and, although the two petitioners later attempted to withdraw their petition on the ground that permission to file a joint tariff had been granted, the Commission nevertheless ordered that the proceedings be reopened in all sixteen certificates, and three Temporary Authorities, "solely to determine what, if any, changes or modifications should be made in the conditions contained in the outstanding certificates of public convenience and necessity . . . ."

After a hearing at which Transport and Railway appeared, but refused to introduce any evidence, and after oral argument on the examiner's report, the Commission on January 22, 1948, ordered that all sixteen certificates be modified to include uniformly the substance of the five conditions set out above, specifically as follows:

> "1. The service to be performed by applicant shall be limited to service which is auxiliary to, or supplemental of, the train service of The Texas and Pacific Railway Company, The Weatherford, Min-

---

[8] 41 M. C. C. 721, 726.

eral Wells and Northwestern Railway Company, or Texas-New Mexico Railway Company, and, between El Paso and Sierra Blanca, Tex., the train service of Texas and New Orleans Railroad Company, hereinafter called the railways.

"2. Applicant shall not render any service to or from any point not a station on a rail line of the railways.

"3. No shipments shall be transported by applicant between any of the following points, or through, or to, or from, more than one of said points: New Orleans, Alexandria, and Shreveport, La., Texarkana, Tex.-Ark., Fort Worth-Dallas, (considered as one), Abilene, Monahans, and El Paso, Tex.

"4. All contractual arrangements between applicant and the railways shall be reported to us and shall be subject to revision if and as we find it to be necessary, in order that such arrangements shall be fair and equitable to the parties.

"5. Such further specific conditions as in the future we may find necessary to impose in order to insure that the service shall be auxiliary to, or supplemental of, the train service of the railways." [9]

The effect on appellee was to bar it from issuing its own bills of lading or performing all-motor service under all-motor local rates or all-motor joint rates with connecting motor carriers, or substituting rail service for motor service, and it could not be a party to such tariffs.[10] Prior to these proceedings the appellee had issued its own bills of lading and participated in motor-carrier tariffs. The

---

[9] 47 M. C. C. 753, 763–764.

[10] 47 M. C. C. 753, 754, and Rules 30, 107 (a) and 107 (b) of Supp. No. 5 to I. C. C. Tariff Circular No. 20. See 41 M. C. C. 721, 726, excerpted at note 19, No. 25, *United States* v. *Rock Island Motor Transit Co.*, decided today, *ante*, p. 419.

District Court found the value of the certificates, $65,000, would be destroyed and $240,000 annual revenue lost.

A petition for reconsideration of this order, and for oral argument before the entire Commission, was denied on May 9, 1949. Transport thereupon brought this suit in the Federal District Court, seeking to set aside the Commission's orders of January 22, 1948, and May 9, 1949, and to enjoin their enforcement. In the District Court proceedings the Regular Common Carrier Conference of American Trucking Associations intervened on behalf of the Commission. After hearing, the District Court made findings of fact and conclusions of law, and entered a judgment setting aside the Commission's orders, and permanently enjoining it from imposing any condition on Transport's certificates "in such manner as will prohibit petitioner from:

"a. Filing, publishing and maintaining common carrier motor rates as provided by statute in the case of common carrier motor carriers generally;

"b. Interchanging traffic with other common carrier motor carriers on joint motor rates;

"c. Issuing its own bills of lading and tendering its service to the public generally on its own contracts of shipment;

"d. Transporting traffic to, through, from or between any so-called 'key points' on that part of its route covered by interstate certificates of public convenience and necessity, to which no 'key point' restriction attached on issuance of such certificates,

or in such manner as will restrict petitioner to ship on rail rates or on railroad bills of lading."

From this judgment the Commission and the intervenor, Common Carrier Conference, appeal here.

The District Court, 87 F. Supp. 107, 112, reasoned that the operations of Transport were at all times and in all

ways auxiliary to and supplemental of the rail operations and therefore could not be restricted as attempted. The connotation of auxiliary and supplementary to the trial court was only a restriction limiting service to rail points. Without dealing specifically with the reservation to impose further conditions restricting the motor carrier's service to coordinated rail service, the District Court decided that the Commission's order restricting the service could not be valid in view of § 216, Transportation Act of 1940, 49 Stat. 558, 54 Stat. 924. That section allows motor common carriers to establish through routes, joint rates, practices and division of charges with other carriers by motor, rail or water.[11] It held, too, that the Commission's action was in essence a revocation in part of a certificate and unlawful except under conditions prescribed by § 212, 49 Stat. 555, 54 Stat. 924, and unconstitutional because confiscatory.

Transport here supports the soundness of the reasons given by the three-judge District Court for its injunction and supplements them by contentions that the Commission's order was without support in the evidence and that Transport was not accorded due process of law at the hearing of October 17, 1944, 47 M. C. C. 753, 755. In view of our decision of today upholding the Commission in No. 25, *United States* v. *Rock Island Motor Transit Co., ante,* p. 419, all reasons for affirming the judgment below may be promptly rejected.

So far as the above issues relied upon by the District Court for its injunction are concerned, they seem to have been resolved in favor of the Government by our opinion in the *Rock Island* case. This proceeding involves certifi-

---

[11] "Thus, while the Commission might prescribe the points to be served, it could not forbid the participation in joint rates and through routes for the simple reason that such a provision would be inconsistent with the wording of Sec. 216 of the Act." 87 F. Supp. 107, 112.

cates for new routes under § 207. No such certificates or applications were in that case. The opinion, however, considered the Commission's practice in § 207 proceedings and stated that it was the same as in §§ 5 and 213 acquisition proceedings. We now hold that the same considerations justify the reservation in issue here. See n. 2, *supra.*

Transport's position that the order in question was without support in the evidence is based on the theory that as evidence was taken in the original applications that resulted in the necessary findings under §§ 213 of the Motor Carrier Act and 5 of the Transportation Act of 1940 for certificates to railroad motor carrier affiliates, changes in practices cannot now be made without evidence that the formerly permitted practices had been inconsistent with the public interest and did unduly restrain competition. *American Trucking Associations, Inc.* v. *United States,* 326 U. S. 77, 86, and *Interstate Commerce Commission* v. *Louisville & Nashville R. Co.,* 227 U. S. 88, 91.[12]

The *Louisville & Nashville* case required a full hearing and the privilege of introducing testimony before the road's rates were set aside as unreasonable. The Commission was taking the position that the Hepburn Act allowed it to set aside rates after a "hearing" without evidence. The *American Trucking* case dealt with the issuance of a series of certificates by the Commission to a railroad-affiliated motor carrier after refusal to admit evidence of the flow of truck traffic between various localities along the parent railroad, and of the effect of the existing

---

[12] Several Commission decisions on the general necessity of evidence to support rulings are added. *Greyhound Corporation—Control,* 50 M. C. C. 237, 242; *Scannell—Control,* 50 M. C. C. 535, 541; *C. & D. Motor Delivery Company—Purchase—Hubert C. Elliott,* 38 M. C. C. 547, 553; *Joint N. E. Motor Carrier Assn., Inc.* v. *Rose and Welloff,* 43 M. C. C. 487, 488. None bear on such a situation as this. They relate to restrictions on the issue or transfer of certificates and revocation.

and prospective railroad-affiliated motor carriers on the over-the-road carriers. On appeal from an affirmance by a district court, we reversed the Commission.

This situation, however, differs from those referred to by Transport in that the Commission has reopened the proceedings, after they were started by Transport for an interpretation of its right to file and maintain a motor common-carrier tariff. Hearings were had in 1942 at Dallas, at which appellee's witnesses gave testimony as to the freight interchange between appellee and other motor carriers and the existence of tariffs, etc. After the report of the Commission referred to on pp. 454–455, Transport and the Texas and Pacific Railway petitioned for reconsideration by the Commission, setting out the facts of their current operations, and addressing themselves particularly to the elimination of the prior or subsequent rail-haul condition. Thereafter the proceedings were reopened to determine what changes or modifications should be made. Another hearing was held, October 17, 1944, and report made. At that hearing Transport appeared but refused to introduce evidence. The examiner examined an official of Transport as to the nature and extent of Transport's operations. This evidence developed the fact that Transport operated both on motor-carrier and rail rates under its own bills of lading in full competition with other motor carriers. Thus there appears in the record adequate evidence of the circumstances of Transport's operations.

Upon the due-process point we approve the ruling of the Commission. It follows:

"Applicant argues that the notice setting the proceedings for further hearing did not inform it or the other parties of the nature of the issues to be met, or give them sufficient time to prepare to meet the issues; and that the hearing, in view of the request

for its cancellation, was in the nature of an ex parte proceeding. We are not impressed with applicant's argument that it was unable to foresee the issues. The notice in question stated that the further hearing was for the purpose of determining what changes, if any, should be made in the conditions, and thus placed the conditions themselves in issue. One of these is condition 5 or 5A, which in itself was adequate notice to applicant and the other parties that the primary purpose of the further hearing would be to determine, as provided for in that condition, whether it is necessary to change or modify the existing conditions or to add others so as effectively to restrict applicant's operations to service which is auxiliary to or supplemental of rail service. Applicant was given the opportunity of presenting evidence to show that no need exists for a change in its present conditions; however, not only did it choose not to offer such evidence, but it objected to the receipt of any evidence with respect thereto. In the circumstances, the examiner properly denied its motion to discontinue the further hearing and to withdraw its witness, and properly overruled its objection to the adduction of testimony through such witness." [13]

The judgment of the three-judge District Court is reversed and the proceedings remanded with directions to dismiss the complaint.

*Reversed.*

Mr. Justice Black, Mr. Justice Douglas, Mr. Justice Jackson and Mr. Justice Burton dissent.

[13] 47 M. C. C. 753, 756.