**ARROWHEAD FREIGHT LINES, Limited,
v. UNITED STATES et al.**

Civ. No. 15356.

United States District Court
S. D. California, Central Division.
Aug. 31, 1953.

---

16. See Koehler v. United States, 7 Cir., 200 F.2d 588, at page 592.

Prentiss Moore, Bart F. Wade, and Ralph H. Nutter, Los Angeles, Cal., for plaintiff.

Edward M. Reidy, Chief Counsel Interstate Commerce Commission, Washington, D. C., Leo H. Pou, Assistant Chief Counsel Interstate Commerce Commission, Washington, D. C., Nell Guinn, Washington, D. C., William L. Harrison, San Francisco, Cal., for defendant Interstate Commerce Commission.

Stanley N. Barnes, Asst. Atty. Gen., Washington, D. C., James E. Kilday and John H. D. Wigger, Sp. Assts. to Atty. Gen., Washington, D. C., Laughlin E. Waters, U. S. Atty., Los Angeles, Cal., Clyde C. Downing and James C. R. McCall, Asst. U. S. Attys., Los Angeles, Cal., for defendant United States.

Before STEPHENS, Circuit Judge, and MATHES and JAMES M. CARTER, District Judges.

MATHES, District Judge.

Plaintiff, a common carrier by motor vehicle, sues "to enjoin, set aside, suspend and annul a certain report and order made and entered by Division 5 of the Interstate Commerce Commission" on October 17, 1952 in a proceeding entitled "Transportation Activities of Arrowhead Freight Lines, Ltd., Docket No. MC–C–1052." 61 M.C.C. 131 (1952).

The challenged order directs plaintiff "to cease and desist * * * from the performance of transportation * * * of the character indicated in said report to be beyond the scope of its authority." See 61 M.C.C. at 142. The effective date of compliance by plaintiff has been postponed by the Commission pending hearing and determination of this action.

Jurisdiction of this court is invoked under 28 U.S.C. § 1336. See also: Id. §§ 2321–2325, 2284, 1398; 49 U.S.C.A. § 17(9); 5 U.S.C.A. § 1009; Am. Trucking Ass'ns v. United States, 344 U.S. 298, 318–320, 73 S.Ct. 307; United States v. L. A. Tucker Truck Lines, 1952, 344 U.S. 33, 173 S.Ct. 67.

Since prior to June 1, 1935, the effective "grandfather"-certificate date specified in the Motor Carrier Act of 1935, 49 Stat. 543, 551 (1935), 49 U.S.C.A. § 306, plaintiff has been engaged continuously in the transportation of property by motor vehicle between Los Angeles Harbor and Ogden, Utah, serving various intermediate points including Salt Lake City. Plaintiff's present certificate No. MC–69526 authorizing this operation stems from a "grandfather"-certificate issued pursuant to § 206(a) of the Interstate Commerce Act, 49 U.S.C.A. § 306(a). This certificate is involved in another case this day decided in this court, Arrowhead Freight Lines, Ltd. v. U. S., D.C.S.D.Cal.1953, 115 F.Supp. 537.

Pursuant to authority granted by the Commission, plaintiff purchased on September 21, 1942 the operating rights of Rapid Express, Inc., to transport "express" between Weiser, Idaho and Salt Lake City. Arrowhead Freight Lines-Purchase-Rapid Exp., Inc., 38 M.C.C. 558 (1942).

The operating rights thus acquired by plaintiff had been embraced in a certificate issued to Rapid Express on May 26, 1937 pursuant to a "grandfather"-clause application under § 206(a) of the Act, 49 U.S. C.A. § 306(a). By that certificate Rapid Express was merely authorized to transport "express" between Weiser, Idaho and Salt Lake City over the route and between the points indicated.

In consolidated certificates thereafter issued by the Commission to plaintiff, No. MC–69526, the phrase "general commodities moving in express service" was substituted for the single word "express" in describing the operating rights acquired through this purchase.

By schedule filed to become effective April 25, 1949 plaintiff proposed, under its authority to transport "general commodities moving in express service," to establish initial rates on liquid petroleum products, in tank trucks in bulk, from Salt Lake City to points in Idaho over the route to Weiser. 49 U.S.C.A. § 6. Protests were filed based upon the contention that plaintiff's operating authority over the route to Weiser did not permit such service. An investigation and suspension proceeding followed, 49 U.S.C.A. § 15(7), and the effective date of

the proposed rates has been voluntarily postponed by plaintiff pending final order in the proceeding under review here. Investigation and Suspension Docket No. M–3022, Petroleum Products, Arrowhead Freight Lines, Ltd.

The proceeding here under review arose while the investigation and suspension proceeding just described was pending. The Commission, Division 5, 49 U.S.C.A. § 17, upon its own initiative commenced an investigation of the transportation activities of plaintiff pursuant to § 204(c) of the Act, 49 U.S.C.A. § 304(c).

Section 204(c) of the Act provides that: "Upon complaint in writing * * * or upon its own initiative without complaint, the Commission may investigate whether any motor carrier * * * has failed to comply with any provision * * * or with any requirement * * *. If the Commission, after notice and hearing, finds upon any such investigation that the motor carrier * * * has failed to comply with any * * * provision or requirement, the Commission shall issue an appropriate order to compel the carrier * * * to comply therewith." 49 U.S.C.A. § 304(c).

As stated in the report of Division 5, the investigation proceeding under review was "instituted * * * for the purpose of determining (1) whether the presently effective certificate * * * held by * * * Arrowhead Freight Lines * * * should be corrected by substituting the term 'express' in lieu of the term 'general commodities, moving in express service,' and (2) whether respondent [plaintiff here] has held itself out to the public to perform or has performed transportation in interstate or foreign commerce, as a common carrier by motor vehicle of property which, with respect to the commodities transported and services performed, was or might be beyond the scope of the operating authority described in its presently effective certificate or such certificate as it might be corrected." 61 M.C.C. at 131.

To quote further from the report:

"As indicated, Rapid's certificate was issued after informal proceedings on a 'grandfather'-clause application. On June 1, 1935, the critical date for determination of common carrier 'grandfather' rights, Rapid was engaged in proving an expedited delivery service over the route and between the points indicated utilizing light equipment with limited carrying capacity, in order to maintain the speed of delivery required. The backbone of the operation appears to have been the distribution of motion picture film and related items to theatres along the route, but a considerable amount of miscellaneous small-package freight was also handled in connection therewith. * * *

"Since the acquisition by respondent of the operating rights of Rapid, certain marked changes have taken place in the operation, with the result that two different types of service are now conducted. The delivery of film and related articles has been continued as a separate service in much the same manner as conducted by Rapid. * * * In addition to the film delivery service respondent has, in effect, established a second service in which it operates large heavy equipment over the route transporting general freight in both truckload and less-than-truckload quantities. * * * Notwithstanding the size of the equipment utilized, the operation, without service at intermediate points, provides overnight delivery from Salt Lake City to Boise. In fact, the heavy units make better terminus-to-terminus time than the lighter film delivery units because of the number of stops made by the latter. A recent investigation * * * indicates that respondent, omitting service at authorized intermediate points, maintains somewhat faster service between Salt Lake City and Boise than the other general-freight carriers operating between these points.

"Except for the film delivery service, respondent's present service over the route here involved is not distinguishable from the general-freight service which it maintains over the balance of its system. It holds authority for the transportation of general commodities, with certain exceptions, between Los Angeles Harbor, Calif., and Ogden, Utah, through Salt Lake City over described regular routes. Operation

over these latter routes is coordinated with operation over the route here involved, at its Salt Lake City terminal. * * * No distinction is made from a rate or tariff standpoint between the non-film traffic handled over the Weiser-Salt Lake City route and the Los Angeles-Ogden route." 61 M.C.C. at 132–134.

The matter was referred by Division 5 to an examiner, 49 U.S.C.A. § 17(10), who conducted a hearing and concluded that plaintiff's authority under the "express" certificate does not authorize "transportation of petroleum * * * in tank trucks, or other services requiring special types of equipment." Plaintiff made no exception to this finding which, as the examiner observed, "should render moot the pending proceeding I & S No. M–3022, Petroleum Products—Arrowhead Freight Lines, Ltd."

The report under review further discloses that:

"In his proposed report the examiner concluded (1) that respondent's [plaintiff's] certificate would not be made more definite by changing the commodity description from 'general commodities, moving in express service' to 'express,' (2) that respondent's certificate does not authorize the transportation of petroleum and petroleum products, in bulk, in tank trucks, (3) that respondent has not been shown to have transported shipments beyond the scope of the provisions of its effective certificate, and (4) that the proceeding should be discontinued. * * *

"The Commission has consistently recognized certain fundamental differences between express service and ordinary freight service, both by rail and by motor vehicle. Moreover, concerns engaged in the express business have long been considered as constituting a separate branch of the carrying trade * * * the courts take judicial notice of them as distinct from the carriers engaged in the ordinary transportation of the large mass of common freight. Pfister v. Central Pac. Ry. Co., 1886, 70 Cal. 169, 11 P. 686, 691, 59 Am.Rep. 404. Cf. S. E. C. v. Chenery Corp., 1943, 318 U.S. 80, 87, 63 S.Ct. 454, 86 L.Ed. 626.

"Express carriers by motor vehicle can be divided into three classes, (1) those operating for, or under contract with, the Railway Express Agency, Inc., (2) those operating primarily as passenger carriers, and (3) those operating independently, like respondent, as motor carriers of property. In considering the express service furnished by motor carriers in the first category the Commission has uniformly described them as participants in a distinctive type of expedited transportation wherein the facilities of other forms of transportation are employed under the unified direction and responsibility of the Railway Express Agency. * * * The commodity description in such certificates authorizing service by or for the Express Agency usually read 'general commodities, moving in express service'. * * *

"Carriers in the second category are those engaged primarily in the transportation of passengers. * * *

"The commodity description used in such certificates of passenger carriers has uniformly been the term 'express.'

"The number of carriers in the third category is limited because few independent motor carriers undertake to render this specialized type of service in connection with shipments of other than particular commodities. * * * Authority to transport general commodities without restriction includes the right to transport express. * * * General freight carriers, however, are not generally interested in the transportation of express. * * * Thus while authority to transport general commodities, without restriction, includes the right to transport express, the converse of this is not true, because authority limited to the transportation of 'express' or to 'general commodities moving in express service' is restricted as to the type of service which may be performed by its very terms.

"There are, however, some independent motor carriers who specialize in the transportation of express traffic. Respondent's predecessor did. Among others are Mistletoe Express Service of Oklahoma City, Okla., and Magic Express Incorporated of Tulsa, Okla." 61 M.C.C. at 134–137.

[It was agreed in oral argument at the bar that in the entire country there are only three "independent motor carriers" operating under authority of "express" certificates. Hence the just-quoted phrase "among others" must refer to plaintiff alone.]

The report continues: "It follows that no correction in such certificate is needed. The term 'express' speaks both in terms of commodities and type of service and means 'general commodities in express service.' * * *

"The transportation of express cannot, generally speaking, be distinguished from other types of transportation service on a commodity basis. * * * Express carriers do not utilize special motor vehicle equipment, and, as a result their holding out to transport a somewhat wider variety of commodities than general-freight carriers is necessarily limited to those shipments which can be transported in ordinary equipment. While it is true that safes or other similar containers are sometimes installed in express vehicles for the protection of valuables, neither this, nor the use of refrigerated equipment can be considered as special equipment * * *." 61 M.C.C. at 138–139.

The report continues:

"The remaining question to be determined is whether respondent has held itself out to perform, or has performed, transportation in interstate or foreign commerce of property which with respect to the commodities or service was or is beyond the authority contained in its certificate to the extent it is under consideration herein. * * * we cannot agree that the limitation of motor carrier operations to express service prohibits, *per se*, the transportation of quantity shipments under any and all conditions.

"Essentially express service is a method of transportation by which shipments receive greater care, security, and faster transportation than are accorded ordinary freight either by the same carrier or by other like carriers generally. Express service also involves the idea of regularity as to route, or time, or both. Retzer v. Wood, 1883, 109 U.S. 185, 3 S.Ct. 164, 27 L.Ed. 900. * * * Because express service is marked by an undertaking to provide transportation services superior to that normally required and furnished for ordinary freight it is both appropriate and proper that relative higher charges should be established for it. * * * Thus by inference at least, it would appear that carriers providing express service should not establish the same or substantially the same rates as carriers of general freight. On the contrary their premium service should be bona-fide premium priced if its character is such as to be above challenge. * * *

"Because many of the fundamental distinctions between ordinary freight and express services, particularly those involving independent motor carriers, are matters of degree no definition or differentiation between the two services can precisely delineate the line of demarcation. The problem is further complicated because bona-fide express service is subject to variation depending on the circumstances involved. * * * Moreover the criterion of expedited service as between different types of motor carriers has become somewhat of an anomaly because in performing ordinary line-haul service motor carriers generally utilize equipment having the capacity to exceed authorized lawful speeds. * * * This underlying ability is reflected in the use of the word 'express' in the names of many motor carriers of ordinary freight and the advertising by some to the effect that they provide express service at freight rates. The latter, of course, is actually only intended to indicate that an expeditious service is provided without additional charge.

"As noted, respondent is continuing the transportation of film and related items as a separate service in much the same manner as its predecessor. As has been indicated that service is characterized by the use of relatively light equipment, operating over regular routes, on definite schedules, providing fixed pickup and delivery times with the minimum possible transit time considering the points served, and with such additional protective or custodial services

provided, as required, by the driver or his helper, for which charges are assessed in excess of those for the movement of the same commodities between the same points in ordinary freight service. In view of these indicia we conclude, as we have heretofore indicated, that respondent's service in this respect is, in fact, an express service and therefore within the scope of that portion of its certificate under consideration. The same conclusion, however, is not warranted with respect to the other operations being conducted by respondent between these points. While it is true that all the characteristics considered above need not necessarily be present before we are justified in concluding an express service actually exists, nevertheless most of them should either be evident or their absence explained by reasons which indicate that the overall operations are still essentially in the nature of an express service. The only factor which respondent advances to establish its claim that these particular operations are, in fact, providing its shippers with an express service is the physical movement of its equipment between the termini at the same or somewhat faster time than the other motor carriers. For the reasons previously indicated, this factor, standing alone, is not determinative of this issue. * * * An order will be entered requiring respondent to cease and desist from conducting, or holding out to perform, operations, in interstate or foreign commerce, as a common carrier by motor vehicle of general commodities, in an ordinary freight service, between Weiser, Idaho, and Salt Lake City, Utah, over the route, and to and from the intermediate and off-route points specified therein, and, to abstain from a resumption of such activities, unless and until appropriate authority therefor has been obtained. * * *

"We further find that respondent is and has been engaging, and is and has been holding itself out to the general public to engage, in the transportation by motor vehicle, in interstate commerce, of general commodities, moving in other than bonafide express service, between Weiser, Idaho, and Salt Lake City, Utah, without first having obtained a certificate of public convenience and necessity authorizing it so to operate. * * *

"The cease and desist order entered herein will require respondent, within the time specified therein, to change its method of operation in such a manner as to accomplish a termination of the unauthorized operations now conducted by it, and to file with this Commission and serve upon all other parties of record within a time stated a verified statement of the action taken in order to comply with the requirements of such order. The proceeding will be held open for further consideration of the statement of compliance required to be filed by respondent, and for such further action as may be appropriate." 61 M.C.C. at 139–142.

It appears from the record that Commissioners Lee, Cross and Arpaia comprise Division 5 of the Commission. Apparently Commissioner Arpaia alone was fully satisfied with the report, since Commissioner Cross, concurring specially, approved the report "generally," and Commissioner Lee dissented, as follows:

"Cross, Commissioner, concurring specially. I approve the report generally, but am not in accord with the expression therein to the effect that refrigerated equipment may not be considered as special equipment.

"Lee, Commissioner, dissenting: I am unable to join in the findings of the majority that certain of respondent's operations are not and have not been shown to be within the scope of its present certificate. In my opinion, this investigation should be discontinued. However, I concur in the statement in the report to the effect that refrigerator equipment is not special equipment." 61 M.C.C. at 142–143.

As previously stated, the order predicated upon the report, as entered on October 17, 1952, directs plaintiff "to cease and desist and thereafter to refrain and abstain from the performance of or the holding out to perform transportation, in interstate and foreign commerce, of the character indicated in said report to be beyond the scope of its authority." See 61 M.C.C. at 142.

Plaintiff filed a petition for reconsideration by the entire Commission which was

denied. —— M.C.C. —— (1953). This suit to annul the Commission's order of October 17, 1952 followed.

■ Upon trial, the entire record of the proceeding before the Commission was received in evidence, and the case was then argued and submitted for decision. The challenged order is to be judged by "the report, read as a whole", United States v. State of Louisiana, 1933, 290 U.S. 70, 80, 54 S.Ct. 28, 33, 78 L.Ed. 181, and "by the record as a whole out of which the report arose." City of Yonkers v. United States, 1944, 320 U.S. 685, 695, 64 S.Ct. 327, 333, 88 L.Ed. 400.

■ The Supreme Court has said that "the purpose of the 'grandfather clause' was to assure those to whom Congress had extended its benefits a 'substantial parity between future operations and prior bona fide operations'." United States v. Carolina Freight Carriers Corp., 1942, 315 U.S. 475, 481, 62 S.Ct. 722, 726, 86 L.Ed. 971; Alton R. Co. v. United States, 1942, 315 U.S. 15, 22, 62 S.Ct. 432, 86 L.Ed. 586.

As to the scope of the "parity" concept with respect to territory permitted to be served, it was said in Alton R. Co. v. United States, supra, 315 U.S. at pages 20–21, 22–23, 62 S.Ct. at page 436, 86 L.Ed. 586: "The characteristics of the transportation service involved as well as the geographical area serviced are relevant to the territorial scope of the operations which may be authorized under the 'grandfather clause'. * * * it does not necessarily restrict future operations to the precise points or areas already served. * * * In view of the scope of * * * holding out and the nature and characteristics of the highly specialized transportation service rendered, the Commission authorized continuance of * * * service to all points in the enumerated states. That is a judgment which we should respect. Certainly we cannot say that it was a wholly inappropriate method for creating that substantial parity between future operations and prior bona fide operations which the statute contemplates. * * * That judgment is for the administrative experts, not the courts." Cf. McDonald v. Thompson,

1938, 305 U.S. 263, 266, 59 S.Ct. 176, 83 L.Ed. 164.

As to the scope of the concept with respect to commodities permitted to be carried it was said in United States v. Carolina Freight Carriers Corp., supra, 315 U.S. at pages 482–483, 484, 486, 62 S.Ct. at page 726, 86 L.Ed. 971:

"The Commission ruled that since a 'common carrier' may transport only a 'class or classes of property', the authority granted under the 'grandfather clause' of § 206(a) 'should reflect any limitation in the undertaking' of the common carrier 'as indicated by the service actually rendered on and since the statutory dates.' It accordingly proceeded to eliminate commodities which, though of the same general class as the others, had been carried before but not after June 1, 1935. It further restricted future operations to those commodities which prior and subsequent to June 1, 1935, had been carried in substantial amounts and with a degree of regularity. We would not disturb those conclusions if only a question as to the weight of the evidence was involved. But we are not satisfied that the Commission applied the proper criterion in reaching its conclusion that only specified commodities could be carried in the future.

"Sec. 206(a) requires a showing that the applicant, or its predecessor, was 'in bona fide operation as a common carrier' on June 1, 1935, and 'since that time'. By § 208(a) the certificate must specify 'the service to be rendered' by the carrier. * * * It is plain that a carrier's holding out and actual performance may be limited to a few articles only. That is to say he may be a common carrier only of a restricted number of commodities. * * * On the other hand, if the applicant has carried a wide variety of general commodities, he cannot necessarily be denied the right to carry others of the same class merely because he never carried them before. And where he has carried a wide variety of general commodities, he cannot necessarily be restricted to those which he carried with more frequency and in greater quantities than the others. * * * The

questions are whether his service within the territory in question was sufficiently regular and whether his coverage of commodities was sufficiently representative to support a finding that he was in 'bona fide operation' as a 'common carrier' of the group of commodities or of the class or classes of property during the periods in question. * * * It follows from what has been said that a restriction on commodities which may be carried between specified points may not always be justified. * * * Presumptively one who had established his status of 'common carrier' would be entitled to carry all of the commodities embraced in his undertaking to all points to which any shipments of any articles were authorized."

The problem before the Commission in the proceeding here was to apply the "parity" concept, not to the territory permitted to be served or the class of property permitted to be carried, but to the type of service permitted to be rendered.

When in 1937 the "grandfather" certificate was issued to Rapid Express, it was within the Commission's power "to limit * * * future operations to the type of equipment and service previously offered * * *." Crescent Express Lines v. United States, 1943, 320 U.S. 401, 410, 64 S.Ct. 167, 171, 88 L.Ed. 127.

And when in 1942 plaintiff purchased Rapid's operating rights, it was within the Commission's power to condition its approval upon the "purchaser's willingness to accept a narrower certificate than that possessed by the seller", United States v. Rock Island Motor Transit Co., 1951, 340 U.S. 419, 449, 71 S.Ct. 382, 398, 95 L.Ed. 391; and to insert in the purchaser's certificate a "reservation to impose further conditions restricting the motor carrier's service". United States v. Texas & Pac. etc. Co., 1951, 340 U.S. 450, 458, 71 S.Ct. 422, 426, 95 L.Ed. 409; Callanan Road Imp. Co. v. United States, 1953, 345 U.S. 507, 73 S.Ct. 803.

The Commission did neither. Instead the Commission merely inserted in plaintiff's certificate the phrase "general commodities moving in express service" in lieu of the authorization to transport "express" which appeared in the predecessor certificate. Cf. United States v. Seatrain Lines, Inc., 1947, 329 U.S. 424, 67 S.Ct. 435, 91 L.Ed. 396.

It is not for this court to question the Commission's interpretation of the scope of the certificate involved, other than to inquire whether there is some rational basis for the administrative conclusions. Miss. Valley Barge Co. v. United States, 1934, 292 U.S. 282, 286–287, 54 S.Ct. 692, 78 L.Ed. 1260.

"This court is not at liberty to substitute its own discretion for that of administrative officers who have kept within the bounds of their administrative powers. To show that these have been exceeded in the field of action here involved, it is not enough that the * * * [challenged order] shall appear to be unwise or burdensome * * *. Error or unwisdom is not equivalent to abuse." American Telephone & Telegraph Co. v. United States, 1936, 299 U.S. 232, 236, 57 S.Ct. 170, 172, 81 L.Ed. 142.

But as Mr. Justice Cardozo put it in United States v. Chicago, M. & St. P. etc. Co., 1935, 294 U.S. 499, 511, 55 S.Ct. 462, 467, 79 L.Ed. 1023: "We must know what a decision means before the duty becomes ours to say whether it is right or wrong."

As we have seen, the Commission's report declares that "The term 'express' speaks both in terms of commodities and type of service and means 'general commodities in express service' * * *. The transportation of express cannot, generally speaking, be distinguished from other types of transportation service on a commodity basis. * * * Express carriers do not utilize special motor vehicle equipment. * * * Essentially express service is a method of transportation by which shipments receive greater care, security, and faster transportation than are accorded ordinary freight. * * * Thus, by inference at least, it would appear that carriers providing express service should not establish the same or substantially the same rates as carriers of general freight." 61 M.C.C. at 138–140.

The report then explains: "Because many of the fundamental distinctions between ordinary freight and express services, particularly those involving independent motor carriers, are matters of degree, no definition or differentiation between the two services can precisely delineate the line of demarcation. * * * Moreover the criterion of expedited service * * * has become somewhat of an anomaly because * * * motor carriers generally utilize equipment having the capacity to exceed authorized lawful speed. * * * This * * * is reflected in the use of the word 'express' in the names of many motor carriers of ordinary freight and the advertising by some to the effect that they provide express service at freight rates." 61 M.C.C. at 141.

All of which seems to tell us that the so-called "express carrier" finds it impossible to provide better equipment, and unlawful to provide faster service than motor carriers of "ordinary freight"; while motor carriers of "ordinary freight" are permitted to call themselves "express" carriers and to hold themselves out as providing "express service at freight rates."

By a process of exclusion, then, we infer that the only criterion by which the Commission, or the carriers themselves, or any one else, can distinguish "ordinary freight" motor carriers from an "express" motor carrier is that the latter is expected to charge a higher rate for the same service.

If this deduction is sound, a motor carrier of "ordinary freight" is permitted to render an "express service at freight rates," but an "independent motor carrier of express" is only permitted to render like service at higher rates, i. e. "express service" at "express" rates.

The order under review requires plaintiff "to cease and desist * * * transportation of the character indicated in said report to beyond the scope of its authority"; and further requires plaintiff, within the time specified, "to file with this Commission and serve upon all other parties of record a verified statement of the action taken to effect compliance with the requirements. * * *"

Thus the order in substance states that there are plural "requirements" to be performed in order "to effect compliance," and that plaintiff must cease and desist as "indicated in said report" in order to perform the "requirements."

 Perhaps time and change have made the task of the writer of the report logically impossible. Perhaps the fact that only three "independent motor carriers of express" hold certificates today points to the practical necessity of applying by analogy here the ancient common-law maxim *cessante ratione, cessat ipsa lex;* so that when a distinction ceases, the rule governing the distinction should also cease. Funk v. United States, 1938, 290 U.S. 371, 383–386, 54 S.Ct. 212, 78 L.Ed. 369; United States v. McCarthy, C.C.S.D.N.Y.1883, 18 F. 87, 89; Katz v. Walkinshaw, 1903, 141 Cal. 116, 70 P. 663, 74 P. 766, 64 L.R.A. 236; Beardsley v. City of Hartford, 1883, 50 Conn. 529, 541–542, 47 Am.Rep. 677.

As to that we of course express no opinion. Furthermore, as said in United States v. Carolina Freight Carriers Corp., supra, 315 U.S. at pages 489–490, 62 S.Ct. at page 730, 86 L.Ed. 971: "We express no opinion on the scope of the certificate * * *. That entails not only a weighing of evidence but the exercise of an expert judgment on the intricacies of the transportation problems which are involved."

 Solely because of the indefiniteness of the Commission's order as to the "requirements" which are "indicated" in the report, the order under review must be annulled and the proceeding recommitted to the Commission.

 "In returning the case we emphasize that we do not question the Commission's authority to adopt and apply general policies appropriate to particular classes of cases, so long as they are consistent with the statutory standards which govern its action and are formulated not only after due consideration of the factors involved but with sufficient explication to enable the parties and ourselves to understand, with a fair degree of assurance, why the Commission acts as it does. * * * We do not undertake to tell the Commis-

sion what it should do * * *. We only require that, whatever result be reached, enough be put of record to enable us to perform the limited task which is ours." Eastern-Central Motor Carriers Ass'n v. United States, 1944, 321 U.S. 194, 211–212, 64 S.Ct. 499, 508, 88 L.Ed. 668.

■ Before recommitting the proceeding we should direct attention to the fact that the findings set forth in the report declare that plaintiff is engaged in motor carrier transportation of general commodities "moving in other than bona-fide express service between Weiser, Idaho and Salt Lake City, Utah, without * * * a certificate * * * authorizing it so to operate * * *." Further, the report directs that an order be entered requiring plaintiff "to cease and desist * * * as a common carrier by motor vehicle of general commodities, in an ordinary freight service, between Weiser, Idaho, and Salt Lake City, Utah, over the route, and, to and from the intermediate and off-route points. * * *" 61 M.C.C. 142.

The record shows that plaintiff operates from Los Angeles Harbor to Ogden, Utah, under authority [MC–69526] permitting an "ordinary freight service." From Salt Lake City to Ogden this "ordinary freight" route overlaps the "express" route to Weiser, which is involved in the proceeding at bar.

The record also shows that plaintiff operates from Salt Lake City to Pocatello, Idaho, under a certificate [MC–69526, Sub. 10] permitting an "ordinary freight service." From Salt Lake City to Ogden, this "ordinary freight" route likewise overlaps the "express" route to Weiser; and further overlaps the "express" route between Ogden and Brigham, Utah.

Literally, then, the order to cease and desist as "indicated" in the report requires plaintiff to cease service, and in effect partially revoke certificates, not involved in the proceeding.

For the reasons stated, the Commission's order of October 17, 1952 must be annulled, and the matter recommitted to the Interstate Commerce Commission for such further proceedings as the Commission may see fit to take, consistent with this opinion.

Plaintiff will submit findings of fact, conclusions of law and judgment accordingly, pursuant to local rule 7 within ten days.