**MISSOURI PACIFIC TRUCK LINES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Nos. 98–79T, 604–80T.**

United States Claims Court.

July 13, 1983.

See also 2 Cl.Ct. 421.

Robert T. Molloy, Vienna, Va., for plaintiff. Richard M. Johnson and Gary D. Stanfield, Molloy & Johnson, P.C., Vienna, Va., of counsel.

George L. Squires, Washington, D.C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., Washington, D.C., for defendant. Theodore D. Peyser, Jr., Dept. of Justice, Washington, D.C., of counsel.

OPINION

NETTESHEIM, Judge.

These consolidated cases concern the application of the Railroad Retirement Tax Act, 26 U.S.C. §§ 3201–3233 (1976) (the "RRTA"), to plaintiff Missouri Pacific Truck Lines, Inc. ("MoTruck" or "plaintiff"), and Texas and Pacific Motor Transport Co. ("TexTruck") for the years commencing with the second quarter of 1973 and continuing through 1976. MoTruck and TexTruck merged in 1977, with MoTruck the surviving entity. During the years in suit, both MoTruck and TexTruck were wholly owned, respectively, by Missouri Pacific Railroad Co. ("MoRail") and Texas and Pacific Railway Co. ("TexRail"). MoRail, in turn, owned almost all the stock of TexRail, and MoRail was owned by the Missouri Pacific Corp.

The issue of first impression for decision is whether MoTruck and TexTruck (collectively referred to as the "trucking subsidi-

aries" or "truck lines") were "employer[s]" within the meaning of 26 U.S.C. § 3231(a), and therefore liable for the employment excise tax under the RRTA. Section 3231(a), in paraphrase, defines an " 'employer' " as any carrier (*i.e.*, any express carrier, sleeping car carrier, or rail carrier providing transportation subject to Part 1 of the Interstate Commerce Act, 49 U.S.C. §§ 1–27 (1976)), and any company owned by a carrier "and which operates any equipment or facility or performs any service (except trucking service, casual service, and the casual operation of equipment and facilities) in connection with the transportation of . . . property by railroad, or the receipt, delivery, . . . transfer in transit, . . . storage, or handling of property transported by railroad . . . ." Resolution of the issue, as framed by defendant, requires a determination of whether the trucking subsidiaries are carriers in the first instance or qualify for the "trucking service" exception.

## BACKGROUND

During the years at issue, the trucking subsidiaries paid and collected taxes on their employees pursuant to the Federal Insurance Contribution Act, 26 U.S.C. § 3121(d) (1976) ("FICA"), and the Federal Unemployment Tax Act, 26 U.S.C. § 3306(i) (1976) ("FUTA"). MoTruck acted pursuant to an October 9, 1951 letter ruling from the Internal Revenue Service (the "IRS") to its predecessor, Missouri Pacific Freight Transport Co. ("MoFreight"), holding that MoFreight was not an employer under the definition of that term in the RRTA, but instead performed "trucking service" within the meaning of the RRTA exception. Tex-

Truck was exempted from paying into the Railroad Retirement Fund in 1965.[1] In 1974 the IRS determined in Revenue Ruling 74–552, 1974–2 C.B. 338, that a carrier-owned piggyback (trailer or container moving on railway flatcar) service company which provided a railroad some trucking service; ramped and deramped trailers on and off of flatcars; leased trailers, trailer chassis, and containers to its railroad parent; and repaired the leased equipment and similar equipment used by the parent company was an employer under section 3231(a) of the RRTA.[2]

On June 19, 1978, the IRS assessed MoTruck for RRTA taxes from 1971–74 and on September 22, 1978, made an additional assessment for the years 1975–76. A deficiency for RRTA taxes for 1971–74 was assessed against TexTruck on July 10, 1978; assessments for the years 1975–76 followed on September 20, 1978. In 1978 MoTruck made partial payments for the assessed liabilities of MoTruck and TexTruck for the tax years 1974 and 1976, which enabled it on November 13, 1978, to file claims for refund with the IRS. These claims were denied on January 31, 1979.

MoTruck petitioned the United States Court of Claims seeking to recover its partial payment, plus interest, for the year 1976, as well as an expungement of the remaining uncollected 1976 assessments. Plaintiff's petition in No. 604–80T sought expungement of TexTruck assessments, refund of partial payments for the years 1974 and 1976, and refund of MoTruck's partial payment for 1974.

1. Apparently since 1939 MoFreight and Tex-Truck had paid into the Railroad Retirement Fund. The change in MoTruck's tax status was based on representations, as recited in the 1951 letter ruling, that MoFreight "no longer performs an 'express-freight' service whereby L.C.L. [less than carload] freight on its billing is transported by rail under agreement with the railroads . . . ."

The Railway Retirement Board's (the "RRB") letter ruling of December 20, 1965, exempting TexTruck from employer status under the Railroad Retirement Act and the Railway Unemployment Insurance Act, also referred to the

cessation of express-freight traffic. Based on representations as to TexTruck's operations in 1965, the RRB concluded that services in connection with transportation of property by railroad were "so insubstantial" as to be excepted as casual service. No IRS ruling appears in the record.

2. While a revenue ruling may be helpful in defining a term, it is not binding on the court. *E.g., Overbeck & Assoc. v. United States,* 445 F.2d 1142, 1147 (5th Cir.1971); *Pacific Far East Lines, Inc. v. United States,* 211 Ct.Cl. 71, 93, 544 F.2d 478, 490 (1976).

Defendant counterclaimed against Mo-Truck for unpaid employment taxes for the last three quarters of 1973, the years 1974 and 1976, and the third quarter of 1975 and against TexTruck for the last three quarters of 1973 and the years 1974 and 1976. After crediting MoTruck's and TexTruck's FICA and FUTA payments against their RRTA liabilities, defendant's counterclaim as of trial was in the amount of $7,275,-778.60 against MoTruck and $5,247,069.18 against TexTruck, including assessed interest.

The regulatory and fiscal background against which the facts present themselves begins with the Interstate Commerce Act, ch. 104, 24 Stat. 379 (1887), regulating interstate rail and water transportation. The 1930's saw the advent of New Deal rail legislation, including amendments to the Railway Labor Act, Pub.L. No. 73–442, 48 Stat. 1185 (1934) (which included the provision here in issue); the Federal Employers' Liability Act, Pub.L. No. 76–382, 53 Stat. 1404 (1939); the Railroad Retirement Act of 1934, Pub.L. No. 73–485, 48 Stat. 1283 (1934); the Carriers Taxing Act Pub.L. No. 74–400, 49 Stat. 974 (1935) (predecessor to the RRTA); and the Railroad Unemployment Insurance Act, Pub.L. No. 75–722, 52 Stat. 1094 (1938). The Motor Carrier Act, Pub.L. No. 74–255, 49 Stat. 543 (1935), gave the Interstate Commerce Commission (the "ICC") jurisdiction over interstate motor carriers in order to prevent rail subsidiary truck lines from competing with motor carriers in over-the-road service. *See ICC v. Parker,* 326 U.S. 60, 71, 65 S.Ct. 1490, 1495, 89 L.Ed. 2051 (1945). Railroads could acquire motor carriers only upon demonstrating that the trucking service would serve to improve the rail carriers' railroad transportation. § 213(a)(1), 49 Stat. 556. The ICC refined this policy by restricting railroad trucking service to that "auxiliary to,

or supplemental of" railroad transportation. *See, e.g., United States v. Texas & Pacific Motor Transport Co.,* 340 U.S. 450, 453, 71 S.Ct. 422, 423, 95 L.Ed. 409 (1951). Thus, the "trucking service" exception first was enacted one year before trucking operations of rail carriers were wed by the Motor Carrier Act to transportation by rail.

## FACTS

*Overview of the Trucking Subsidiaries*

MoTruck was incorporated in 1938; TexTruck, in 1929. Between 1971 and 1976,[3] MoTruck held 39 Certificates of Public Convenience and Necessity permitting operations as a common carrier by motor vehicle issued under Part 2 of the Interstate Commerce Act. 49 U.S.C. § 301. During the same period, TexTruck held 35 such certificates. Neither trucking subsidiary was certified under Part 1 of the Interstate Commerce Act applicable to common carriers by railroad. 49 U.S.C. § 1.[4] MoTruck operated between 14,000 and 15,000 highway miles under ICC certificates; TexTruck, approximately 3,600 miles. Both MoTruck and TexTruck held state certificates authorizing operation as motor carriers. The trucking subsidiaries did not own or operate any railroad cars, locomotives, railroad tracks, yards, or other railroad facilities, although they rented from their rail parents, as did other truck lines, space in railroad terminals, *inter alia,* for storage.

MoTruck owned and operated approximately 135 trucks and 390 truck tractors; TexTruck, 150 trucks and 200 truck tractors; and 2,600–3,000 trailers were owned by the truck lines. Movement of trailers among carriers was facilitated by interchange agreements. The truck lines participated in the Equipment Interchange Association among motor carriers and the Asso-

---

**3.** Although defendant's objection that the years 1971–76 exceed those in issue is technically correct, both parties offered evidence covering this time period, *e.g.,* defense witness Marshall R. Noecker's expert opinion was based on data for these years, inclusive.

**4.** Part 2 of the Interstate Commerce Act exempted the trucking subsidiaries from regulation under Part 1 (except as to qualifications and maximum hours of service of employees and safety of operation and equipment), but subjected the truck lines to regulation under Part 1 in the performance within terminal areas of transfer, collection, or delivery service.

ciation of American Railroads, which included as members both rail and motor carriers. Like other motor carriers which also were parties to private interchange agreements, the trucking subsidiaries had such agreements with MoRail and TexRail, whereby all but 600–700 of their trailers were leased on a free-flowing interchange under which the rails paid less to the truck lines than under agreements with other motor carriers.

MoTruck employed from 750 to 949 persons during the period in issue; TexTruck, from 477 to 725. The types of employment included driving, handling cargo, maintaining trucks, as well as administrative, supervisory, sales, and clerical services. Most of the non-salaried employees of both trucking subsidiaries were members of local unions affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America (the "Teamsters").[5] Unionized rail employees were organized according to craft specialities and brotherhoods, e.g., the Brotherhoods of Railroad Engineers, Railroad Trainmen, Railway Clerks, and Railroad Signalmen. The Teamsters' agreements permitted considerably more flexibility in moving the trucking subsidiaries' employees from one work category to another than did those of the Brotherhoods. Although the labor relations and contract negotiations between MoTruck and TexTruck and the unionized employees were conducted in accordance with the National Labor Relations Act, 29 U.S.C. §§ 151–168 (1976), the same activities between railroads and their unionized employees were subject to the Railway Labor Act, 45 U.S.C. §§ 151–188 (1976) (the "RLA"). Benefits were available to MoTruck's and TexTruck's employees from state workmen's compensation laws, whereas railroad employees received benefits under the Railroad Unemployment Insurance Act, 45 U.S.C. §§ 351–367 (1976) (the "RUIA").

*Intermodal Service on the MoRail System*

Prefatory to describing the trucking subsidiaries' operations is a brief discussion of the evolution of intermodal service on the MoRail system. In the 1940's MoTruck began pickup and delivery service for MoRail's LCL (less than carload) freight, supplanting the many drayage firms previously hired by the railroad. Piggyback, TOFC/COFC (trailer on flat car/container on flat car), and intermodal transportation signify movement by rail or truck of trailers or containers transferrable from one mode to the other. The concept originated in the 1800's with "circus loading," or backing trailers up ramps onto flatcars. Piggyback was known in the 1930's, but did not expand until 1955 with the establishment of substituted (for rail) motor service.

In order to serve customers located some distance from railroad tracks, whose needs were met by the trucking industry, intermodal plans were developed, which were characterized by different responsibilities of the shipper, consignee, and rail and motor carriers. Although the truck lines participated in all five plans, three are pertinent: Under Plan I, motor-carrier billed freight, the truck provides pickup and delivery and the rail, carrying trailers owned or leased by motor carriers, substitutes for the motor carrier in the line-haul part of the movement. Plan II, in contrast, is rail-billed freight, whereby the rail provides complete rail door-to-door service to the shipper, including trailers. Pickup and delivery, included in the rail tariff, are furnished by the motor carrier. Under Plan II½, rail-billed freight, transportation is ramp-to-ramp (not door-to-door). Pickup and delivery are handled by the shipper or consignee, usually as local cartage service by a motor carrier. By 1957 containerization began to be utilized. In the 1960's piggyback became

---

5. Some of MoTruck's and TexTruck's freight revenue accounting was performed by rail employees who were members of the Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees. From 57 to 38 MoRail employees and 49 to eleven TexRail employees were involved over the years in suit. MoTruck admits that contracting for use of rail employees for this work appears to be unique in the trucking industry, even among railroad trucking subsidiaries.

a prevalent movement with most railroads. Plans II and II½ were the piggyback arrangements MoTruck and TexTruck engaged in (Plan I since 1973 for TexTruck and for MoTruck since 1975; Plan II since 1966 for both lines), although Plan II½ service was the most widely used during 1971–76.

MoRail was avowedly intermodal by the early 1970's. A published excerpt from a September 14, 1972 speech given by its president read:

> MoPac probably comes as close as any company to providing complete transportation service. We have a large rail network, two wholly-owned trucking subsidiaries. We have invested more than $20 million in terminals and other hardware necessary to handle LTL [less than truck or trailer load]/LCL shipments. We are active in piggyback and containerization. . . .
>
> What we seek . . . what we are making concrete steps towards achieving . . . not 50 years from now but today . . . is the formation of a large, multi-modal organization able to provide every form of transportation.

46 MoPac News —— (Oct. 1972).

By the mid-1970's the trucking subsidiaries sought to handle LCL freight at motor carrier rates. In their petition before the ICC, MoTruck and TexTruck represented:

> If the sought relief is granted, the parent Railroad Companies will cease to handle any LCL shipments on their own billing and all merchandise freight offered to the Railroad Companies will move on the billing of their motor carrier subsidiaries. Petitioners will become the sole agency for the Railroads' small shipment service. The petitioner Truck Lines will become the Small Shipment Division of the MoPac System. . . .

Petition To Amend Certificates of Public Convenience and Necessity, Doc. MC–8,9723 & MC–50,544, at 3–4 (ICC, filed May 13, 1974).

Intermodal operations were to be achieved by a high degree of managerial, financial, and operational integration. For example, C.P. Dirckx, MoTruck's Vice President of Marketing and a sales and marketing officer of MoRail at the time, wrote:

> The coordinated service between a railroad and its own motor carrier subsidiary is basically an internal operation designed for serving the railroad's own points and customers—a substitution of service for economy or flexibility which cannot be achieved by rail alone.
>
> However, this is not the whole picture. The motor carrier will have business of its own—traffic handled on its own billing under its own unrestricted interstate or intrastate certificates or exempt transportation in commercial zones.
>
> To effectively coordinate the business of the railroad with that of the subsidiary trucklines, without either encroaching on the economic stability of the other, requires planning, cooperation, and, *above all, parental control.* The charges for services performed by each for the other must be compensatory and neither parent nor subsidiary may sacrifice earnings and subsidize the other.

*   *   *   *   *   *

> In management control on the Missouri Pacific, the president of the railroads is also chairman of the board of the trucklines. The board has insisted the trucklines be operated as a separate entity, fully competitive in its own field, and charges of each to the other for services performed will be on a compensatory basis—neither will subsidize the other.
>
> *To avoid having a debating team at management level, coordination is vital. For example, the president of our trucklines is also general manager of merchandise operations for our railroad.*
>
> As president he exercises management control of the trucklines in all of its services—those performed for the railroad and those provided direct for outside customers.
>
> As general manager of merchandise operations, he has direct supervision over all freight stations, warehouses and piggyback terminals. He is responsible for ser-

vice on the railroad's small package shipments and piggyback trailer load traffic.

All terminal services and operating functions incidental to piggyback are performed by the trucklines. These include ramping, deramping, pick-up, delivery, loading and unloading when required under the tariffs. The railroad maintains no operating personnel exclusively assigned to piggyback.

M. Fair & E. Plowmann, *Coordinated Transportation—Problems and Requirements* 183–86 (1969) (emphasis added) [hereinafter cited as "*Coordinated Transportation* "].

MoTruck's Assistant Vice President of Operations during the years in suit, Wayne Noll, admitted that the services provided by the trucking lines in connection with railroad freight operations during that period were not casual and agreed that MoRail was implementing a total transportation philosophy to include rail and truck service and that the transportation service was integrated. An example of integrated operations was coordination of railroad and truck line activities by the Intermodal Service and Equipment Utilization Bureau. One of its functions was to balance the demand and supply of highway trailers and railroad flatcars. No salesman was to sell truck lines' services independent of railroad transportation. In fact, the sales calls themselves for the railroad and truck lines were directed to be made together.

MoRail purposefully expanded operations of the trucking subsidiaries for reasons other than to implement the goal of intermodal transportation. For example, MoRail sought to employ Teamsters personnel in its terminal operations and thereby avoid the rigidities of the rail Brotherhoods, as well as to implement MoRail's decision to move out of the unprofitable LCL freight business. Beginning in 1961 MoRail systematically converted 48 of its terminal platform operations for LTL and LCL freight from railroad freight operating with rail personnel to truck line freight platforms with freight personnel, with MoRail absorbing the cost of conversion. MoTruck and Tex-

Truck then leased the platform space. The railroad employees who previously performed pickup and delivery and platform services were offered jobs with the truck lines, but were furloughed and not required to resign their rail employment in order to preserve the option of Railroad Retirement should a retransfer of employment occur.

*The Trucking Subsidiaries' Operations*

From 1971–74, 65 percent of MoTruck's and 55 percent of TexTruck's gross revenues were attributable to MoRail and Tex-Rail, respectively. By 1976, the percentages declined to 33 percent and 23 percent. During the years in issue, MoTruck's and TexTruck's operations, in descending order of revenues, were line haul over-the-road trucking between cities, including pickup and delivery; local cartage for shippers and receivers within commercial zones; and other terminal area services under contract with other carriers. The third category is a principal focus of defendant's concern. Among the terminal services provided by both trucking subsidiaries for the rail parents and other carriers were ramping and deramping of trailers and containers with chassis, side loading and unloading containers without chassis, hostling (moving trailers within terminals), spotting (placing trailers in specific locations), and pulling (taking trailers from locations at which they have been spotted to other locations). Independent trucking companies performed the same terminal services. The cranes and side loaders used in terminal operations were owned by the railroad, as well as the portable ramps, permanent ramps, and weight scales.

Many of the truck lines' operations could be viewed as traditional railroad services either because the services had been provided by rail before the advent of trucks or were contracted out by the railroads or because the entities performing these services were subject to the ICC's railroad regulatory scheme under Part 1 of the Interstate Commerce Act. Line-haul substitute service; piggyback; terminal operations, including pickup and delivery; platform, billing and collecting, transfers, storage of

LCL and later LTL freight; maintenance of trailers and containers; and miscellaneous services, such as cleaning up after train wrecks, would be deemed rail service. This view, advanced by defendant, seeks to confine trucking services to over-the-road long haul and transportation exempt under Part 2 of the Interstate Commerce Act, *i.e.,* cartage for local industries. Most of these operations, however, are performed either by motor vehicle incident to the movement of freight by truck to or from rail (*e.g.,* ramping) or by truck lines' personnel incident to the movement of freight by truck to or from rail (*e.g.,* storage of LCL freight before delivery to consignee). Moreover, non-rail-owned trucking companies or other contractors contracted with MoRail and TexRail in dozens of contracts during the years in suit to perform LCL service or piggyback ramp service and delivery. Similarly, MoTruck and TexTruck performed these services for other rail carriers.

*Commonality of Organization, Financing, and Management of the Trucking Subsidiaries and Rail Parents*

While the advancement of intermodal transportation was a hallmark of plaintiff's activities in 1971–76, the goal was not accomplished, as Mr. Dirckx suggested, without the railroads and their subsidiaries "encroaching on the economic stability of the other." *Coordinated Transportation, supra,* at 185. Nor did he accurately state that "[t]he charge for services performed by each [rail or truck line] for the other must be compensatory and neither parent nor subsidiary may sacrifice earnings and subsidize the other." *Id.* Each of the trucking subsidiaries had its own corporate charter, board of directors, and officers, and its employees were paid on check by MoTruck or TexTruck, drawn on a joint account in the name of the parent railroads. These distinctions are the major indices of corporate separateness, other than sporadic efforts by the trucking lines' president to maintain

some control over charges for services. Indeed, the rail and trucking subsidiaries merged, as defendant's expert proof was calculated to show, organization, financing, and management.

From 1971–76, the roster of directors and officers for the trucking subsidiaries included many officers and directors of the rail parents. Illustrative of this overlap was C.T. Groton, Jr., who was President of the trucking lines and also served as General Manager of TOFC and Merchandise Traffic of MoRail and TexRail from 1971–76. In 1976, a banner year for corporate commonality, all the directors of MoTruck and TexTruck were officers or directors of the rails; five of MoTruck's seven officers and six of TexTruck's eight officers were directors or officers of the rails.[6]

The financing of the trucking subsidiaries also was common—both external and internal. With respect to external financing, all the trucking lines' stock was pledged to their rail parents, so obtaining financing from external sources, such as a general indenture agreement, would have been impossible. In addition, no indication existed that a subsidiary could obtain financing in its own name; there were no debts outstanding in either subsidiary's name; and there was no record of either subsidiary's having obtained financing in its own name. With respect to internal financing, no opportunity was presented during the years at issue for the truck lines to finance internally, as shown by their consistent operating deficits.

The financial relationships between the rail parents and truck lines were calculated to produce economic interdependency. In addition to the artificial trailer lease charges and joint bank account (as to which accounting was individual for the rails and trucks), MoTruck and TexTruck extended preferential rates to their rail parents for some services, for example, in 1974, motor

6. With respect to all three indications of lack of separateness (organization, financing, and management), neither party offered comparative evidence concerning related enterprises engaged in related product lines, specifically,

transporation company parents with transportation company subsidiaries. Plaintiff's expert, however, suggested, not unreasonably, that the same types of coordination would be prevalent in such enterprises.

carrier cost plus five percent to the railroads versus a 20–25 percent add-on in contracts with other railroads. Purchase of the truck lines' motor carrier equipment was accomplished in 1974 by reducing receivables from the affiliates and advancing lease payments to allow sufficient funds for the acquisitions. The working capital of the truck lines was inadequate. A continued series of cash advances, interest free, sustained the trucking lines' operations before 1969. When interest began to be paid, then lease payments increased, presumably to afford the revenues for these payments. The trucking lines were covered by the parents' fire insurance policies for loss and damage claims. Substantial facilities were furnished by MoRail and TexRail to the truck lines at lower than market rates, for example, ramps and cranes.

Commonality of management is demonstrated, for example, by the joint banking account managed by the parents and used to deal with creditors as one entity; the proposal of the trucking lines' president to produce savings on a consolidated basis with the railroads; MoRail's origination of the proposal to create Missouri Pacific Intermodal, Inc., as a subsidiary of MoTruck; and MoRail's insistence that rate changes for the truck lines' terminal services must receive its approval. In fact, MoRail's executive vice president and MoTruck's and TexTruck's president pulled the truck lines' 95 percent operating ratio (which was never achieved) "out of the air."

The existence of MoTruck and TexTruck was not justified solely by their ability to generate income. The truck lines, over the relevant years, displayed operating ratios worse than the industry in general and worse than the operations of four failed motor carriers. Their return on equity was positive combined for only two years. The trucking lines can be characterized as mutually dependent parts of a whole and functioned as necessary adjuncts to the corporate strategy of promoting a total transportation concept.

Defendant acknowledged that its case was not predicated upon a piercing of the corporate veil, yet established that the trucking subsidiaries did not operate as separate corporate entities. At the same time, plaintiff demonstrated that MoTruck and TexTruck performed the same or similar services as other trucking companies insofar as the trucking lines' operations were confined to auxiliary or supplemental service to rail.

In summary, the truck lines' operations were integrated purposefully with those of their parents as part of MoRail's and TexRail's intermodal approach to transportation. Whether this economic and functional interdependence means that MoTruck and TexTruck are no longer within the trucking service exception or are otherwise considered as employers, in turn, depends on what Congress intended to include within that exception.

### DISCUSSION

Section 3231(a) of the RRTA reads in pertinent part:

(a) Employer.

For purposes of this chapter, the term "employer" means *any carrier* (as defined in subsection (g)), and any company which is directly or indirectly owned or controlled by one or more such carriers or under common control therewith, and which operates any equipment or facility or performs any service (*except trucking service, casual service, and the casual operation of equipment or facilities) in connection with the transportation of* passengers or *property by railroad,* or the *receipt, delivery,* elevation, *transfer in transit,* refrigeration or icing, *storage, or handling of property transported by railroad* .... [T]he term "employer" ... shall not exclude any part of the general steam-railroad system of transportation now or hereafter operated by any other motive power ....

(Emphasis added.)

The definition of an employer as "any carrier" is cross-referenced to 26 U.S.C. § 3231(g) (Supp. II 1978):

For purposes of this chapter, the term "carrier" means an express company,

sleeping-car carrier, or rail carrier providing transportation subject to Subchapter I of Chapter 105 of Title 49.

■ When terms within a tax statute are undefined, the court must consider in construing the statute not only the words of the statute, but also the context, purpose of the law, and circumstances under which the terms were used. *E.g., Puerto Rico v. Shell Co.,* 302 U.S. 253, 258, 58 S.Ct. 167, 169, 82 L.Ed. 235 (1937); *Pacific Far East Line, Inc. v. United States,* 211 Ct.Cl. 71, 82, 544 F.2d 478, 484 (1976); *Sea Land Co. v. United States,* 204 Ct.Cl. 57, 69, 493 F.2d 1357, 1364, *cert. denied,* 419 U.S. 840, 95 S.Ct. 69, 42 L.Ed.2d 67 (1974). Legislative history and other relevant external aids may be examined in the process of ascertaining legislative intent. *E.g., Federal Maritime Commission v. Seatrain Lines, Inc.,* 411 U.S. 726, 731–32, 93 S.Ct. 1773, 1777–78, 36 L.Ed.2d 620 (1972); *United States v. Dickerson,* 310 U.S. 554, 562, 60 S.Ct. 1034, 1038, 84 L.Ed. 1356 (1940). The use of legislative history is an art, not a formula and depends largely on the court's sense of what Congress really meant to do. *Robert L. Hart v. United States,* 218 Ct.Cl. 212, 230, 585 F.2d 1025, 1035 (1978). "Congress may be presumed not unskillful in the use of words and highly likely to have enacted what it intended." 218 Ct.Cl. at 230, 585 F.2d at 1035. The court may not substitute its judgment for that of Congress as to the best means of achieving a purpose. *United States v. Calamaro,* 354 U.S. 351, 357, 77 S.Ct. 1138, 1142, 1 L.Ed.2d 1394 (1957); *Greenville Steel Car Co. v. United States,* 222 Ct.Cl. 400, 405, 615 F.2d 911, 914 (1980); *cf. Hardee v. United States,* 708 F.2d 661 at 664 (Fed. Cir.1983) (citing *United States v. Byrum,* 408 U.S. 125, 135, 92 S.Ct. 2382, 2389, 33 L.Ed.2d 238 (1972)) ("When a principle of tax law requires reexamination, Congress is better equipped than a court to define precisely the type of conduct which results in tax consequences.").

As the Court of Claims stated in *Estate of W.R. Lovett v. United States,* 224 Ct.Cl. 32, 49, 621 F.2d 1130, 1140 (1980):

The Internal Revenue Code is the subject of constant oversight and frequent amendments by the Congress and we think it safe to assume that if unintended results occur in some future case, the problem will be brought to the attention of Congress.

The creation of the Railroad Retirement system was preceded by two reports from Joseph B. Eastman, Commissioner of the Interstate Commerce Commission, who was appointed Federal Coordinator of Transportation. The first report dated January 22, 1934, S.Doc. 119, 73d Cong., 2d Sess. (1934), noted the long history of railroading and focused on two problems with the then-current state of the industry: the economic depression and the development of alternative transportation services, principally trucking. *Id.* at 2, 11. Coordinator Eastman identified the possible use of trucks to supplement rail service and the need to facilitate the movement of LCL freight. *Id.* Federal coordination of the railroads, not public ownership, was recommended. *Id.* at 30–37.

The second Eastman report issued on March 10, 1934, S.Doc. No. 152, 73d Cong., 2d Sess. (1934). Appendix E addressed "Railroad Use of Other Transportation Agencies." *Id.* at 264–79. Several types of trucking service in connection with rail transportation were reviewed: container cars for LCL freight (*id.* at 277–78), use of demountable truck bodies (*id.* at 279), and substitute truck for rail service (*id.* at 264). Terminal truck operations were broken into six categories: 1) pickup and delivery service; 2) trucking in lieu of ferry or trap-car service; 3) trucking within terminals or service in lieu of intraterminal rail-car movement; 4) trucking between terminals of different railroads in the same city; 5) trucking in lieu of other rail terminal service, including team service; and 6) local cartage. *Id.* at 265.

These services were provided directly to the rail carrier by their subsidiaries or by independent contractors. *Id.* at 266. Only a few rails performed these services directly, and even then most truck operations

were conducted through subsidiaries. *Id.* at 268. Most line-haul trucking service was substituted for rail and was not service beyond rail routes in competition with independent truck companies, as suggested by defendant. *Id.* at 267. These subsidiaries used rail station facilities owned by their parent railroad companies. *Id.* at 269. The services supplied by subsidiaries were also supplied by independent contractors. *Id.* at 272–74. Coordinator Eastman found that the trucking services expedited the movement of LCL freight and created other economies, especially in the cost of handling. *Id.* at 276. These economies effected a better ability to withstand the competition the rail lines faced from independent truckers. *Id.*

As the Eastman report demonstrates, subsidiaries and independents were performing substantially the same service for railroads in 1934 as in the 1970's. If the activities constituted "trucking service" then, they are also "trucking service" now. Congress' conception of the meaning of that term—as evidenced in the reports which formed the basis for subsequent legislation—included the activities which now alarm defendant. True intermodal services, such as piggyback and containerization, were not as widespread as today, but they did exist and were considered a part of trucking service. *Id.* at 277–79.

*1934 Legislation*

The trucking service exception originated with the 1934 amendments to the Railway Labor Act, Pub.L. No. 73–442, 48 Stat. 1185 (1934) (the "RLA"), and was thereafter incorporated into other railroad legislation, including the predecessor of the RRTA. A bill amending the Railway Labor Act of 1926, Pub.L. No. 69–257, 44 Stat. 577 (1926) (the "RLA of 1926"), to include retirement entitlement and taxing provisions was introduced in each chamber of Congress— H.R. 7650 (on February 5, 1934) in the House and S. 3266 (on March 28, 1934) in the Senate.

Hearings were held for five days in April 1934 by the Senate on S. 3266. *To Amend The Railroad Labor Act: Hearings on S.*

*3266 Before the Senate Committee on Interstate Commerce,* 73d Cong. 2d Sess. (1934) [hereinafter cited as "1934 Hearings on S. 3266"]. The bill as presented to the Committee did not contain an exception for trucking services. As described by Coordinator Eastman, one of the salient purposes of the bill was to expand the coverage of the RLA of 1926, illustratively, to refrigerator car companies and companies hired by railroads to perform maintenance. 1934 Hearings on S. 3266 at 10. Defining carrier by reference to the Interstate Commerce Act, thus expanded the definition of "carrier" to include any company operating equipment or facilities or providing any service within the meaning of the terms "railroad" and "transportation" in that act. *Id.* Coordinator Eastman supported the bill.

M.W. Clement, Chairman of the Committee of the Railroads delegated to deal with the proposed amendments, testified on behalf of the railroads and immediately objected to the broad scope of the bill. Of particular concern was cross-referencing to the Interstate Commerce Act, which encompassed activities having little to do with railroad employees, such as regulation of contractors hired competitively to build railroad bridges that require change or relocation of rail lines. *Id.* at 56–57. Mr. Clement believed that including such tangential workers and consequently many labor unions would delay prompt settlement of labor disputes. *Id.* at 59. He objected to the inclusion of trucking companies and voiced concern over restricting railroads in their trucking activities, given the intense competition between the truck and railroad industries. Many railroads had ventured into pickup and delivery service by contracting with truck companies in order to meet truck competition. *Id.* at 59. Restricting trucking operations of railroads would force railroads out of pickup and delivery service and direct former rail-truck traffic onto the highway, so that competition between railroads and trucking companies would be total. *Id.*

At the conclusion of the hearings, Coordinator Eastman was recalled to discuss

amendments to the bill. He concurred with Mr. Clement's understanding that the bill, as drafted, would include "trucking companies performing terminal services for railroads" in the phrase "other transportation facilities used by or operated in connection with any such carrier by railroads." *Id.* at 145. Coordinator Eastman suggested—in response to Committee Chairman Dill's objection on the ground that cross-referencing the definition of carrier to the Interstate Commerce Act would be impractical—that language patterned on the Interstate Commerce Act be employed. *Id.* This approach excepted independent trucking contractors, but would not have excepted railroad trucking subsidiaries. *Id.* The Committee adopted Coordinator Eastman's suggestion and reported to the Senate on May 10, 1934.

Hearings were held on an identically-worded bill, H.R. 7650 in the House. *Railway Labor Act Amendments: Hearings on H.R. 7650 Before the House Committee on Interstate and Foreign Commerce,* 73d Cong., 2d Sess. 16, (1934). Coordinator Eastman again was the first witness. He explained that he was addressing H.R. 9689 (H.R. 9689, 73d Cong., 2d Sess. (1934), introduced on May 21, 1934, was identical to S. 3266 as reported out by the Senate Committee) and that the coverage included "truck delivery within terminal areas" if performed by a railroad subsidiary, but not if by an independent, contracted-for trucker. *Id.* at 17. Coordinator Eastman stated that S. 3266 originally included both independent truckers and rail-owned subsidiaries, but in reaction to the hearings before the Senate Committee on Interstate Commerce he had decided to create the distinction embodied in the amended Senate bill as reported. *Id.* He then stated that he did not oppose taking trucking out entirely: "[I]f you feel the need of changing that, I am inclined to think the best thing to do would be to take trucking out of this bill entirely and let it all be dealt with under the ... [National Industrial Recovery Act]." *Id.* at 19.

In response to a question concerning coverage of H.R. 9689, Coordinator Eastman distinguished activities by independent truckers for railroad companies (including line-haul), which would not be covered, from the same activities by railroad-owned trucking companies, which would be covered by the RLA. *Id.* at 20. The Coordinator stated, "The language as it is now would include truck delivery within terminal areas." *Id.* at 17. When Rep. Charles A. Wolverton asked why the RLA should apply in one case and not the other when both types of trucking companies engage in the same activities, Coordinator Eastman replied that "the only reason, if it is a sound one" was that including independent truckers would subject them to overlapping jurisdiction under the National Industrial Recovery Act (the "NIRA"), which covered truckers, and the RLA, which covered railroads. *Id.* at 18.

M.W. Clement, who had testified before the Senate Committee on S. 3266, also addressed the House Committee on behalf of the Committee of Railroads delegated to deal with the RLA proposed amendments. *Id.* at 124. The railroads unequivocally opposed including trucking, *id.,* as well as the bill as a whole. *Id.* at 152. Mr. Clement discussed pickup and delivery service and its position in the growth of the relationship between trucks and trains. He noted that neither truck nor rail carriage wished to "kill the child at birth" by including truck employees who were not railroad men when efficient coordination could work to benefit both rail and truck carriers. *Id.* Mr. Clement also commented on the application of the RLA. He opined:

> The bill as written may be construed to bring a trucking company under the bill if a carrier has any ownership in it; but if a carrier only has a contract with a trucking company, without ownership, it does not come under the bill. Both trucking companies do the same character of work in the same community, and the employees of both belong to the same union. It is inconceivable that any such accomplishment could be desired in the act.

*Id.* at 124. The device he proposed was to place after "or performs any service" the

words "by rail," thus excluding rail-owned trucking service. *Id.*

Robert E. Quirk appeared on behalf of what he represented to be independent trucking companies which performed certain terminal services for certain railroads. *Id.* at 157. He opposed inclusion of truckers in H.R. 7650. His objections were three-fold: The relations of teamsters and truckers were separate from the viewpoint and relations of railroad employees; there would be greater burdens on railroad companies than on independent companies that materially would affect competition; and since railroad contracts often constituted less than 20 percent of a trucking company's business, no reason existed to place trucking employees under the RLA, particularly given the difficulty of determining the status of particular employees. *Id.* at 158. His suggestion was to insert after "carrier" the language: "Provided nothing herein shall be construed to apply to employees or persons or corporations operating or engaged in operating motor vehicles upon or over the highways for commercial purposes." *Id.* at 158.

The House Committee on Interstate and Foreign Commerce amended H.R. 9689 by inserting after "service" the words "other than trucking service." Likewise, Senator Dill, Chairman of the Interstate Commerce Committee, offered the same amendment on the Senate floor. The amendment was accepted, 78 Cong.Rec. 12,384 (1934), and the bill was passed. The 1934 Railroad Retirement Act adopted the carrier definition of the RLA.

*1937 Legislation*

The RLA was declared unconstitutional in *Railroad Retirement Board v. Alton,* 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468 (1935). In response to the Supreme Court's objections, Congress passed the entitlement and taxing provisions in separate laws of identical coverage. Railroad Retirement Act of 1935, Pub.L. No. 74–399, 49 Stat. 967 (1935); Carriers Taxing Act, Pub.L. No. 74–400, 49 Stat. 974 (1935). Even these laws fell before railroad opposition. After the railroads won an injunction against the assess-

ment of the taxes in January 1936, *Alton R.R. v. Railroad Retirement Board,* 16 F.Supp. 955 (D.D.C.1936), labor and management, at the behest of President Roosevelt, worked together to propose new legislation for a railroad retirement system. *See* H.R.Rep. No. 1071, 75th Cong., 1st Sess. 2 (1937).

The new law contained, in paraphrase, the same exception from coverage for railroad-owned and -controlled trucking companies. Railroad Retirement Act of 1937, Pub.L. No. 75–162, 50 Stat. 307 (1937) (the "RRA of 1937") ("except trucking service, casual service, and the casual operation of equipment or facilities"). Although the definition of carrier in the law cross-referenced to what is now section 3231(g) (*i.e.,* carrier by railroad subject to Part 1 of the Interstate Commerce Act, and presumably trucking companies in local pickup and delivery were regulated under Part 1), George M. Harrison, President of the Brotherhood of Railway Clerks, testified that the trucking service exception kept trucking subsidiaries out of RRA regulation. *Retirement System for Interstate Carriers' Employees: Hearings on H.R. 6956 Before the House Committee on Interstate and Foreign Commerce,* 75th Cong., 1st Sess. 134 (1937). The colloquy was, as follows:

> Mr. Bulwinkle. Let me ask you this, Mr. Harrison: [Section (g)] states "express company, sleeping-car company, or carrier by railroad subject to Part 1 of the Interstate Commerce Act." That does not take in trucks?
>
> Mr. Harrison. No. You see trucks and buses, truck and bus companies engaged in interstate commerce are subject to Part 2 of the Interstate Commerce Act, and we do not intend to include them under this legislation.

Even in the late 1930's trucks were providing substitute for rail, pickup and delivery, and other terminal area services; yet they were not considered carriers.

*1946 Legislation*

The RRA of 1937 was subject to extensive revision during 1946 to correct a short-

fall in revenue to support the program and to provide more survivor and disability benefits. *See* S.Rep. No. 1710, 79th Cong., 2d Sess., *reprinted in* 1946 U.S.Code Cong. & Ad.News 1316. The preceding debate was similar to the arguments of defendant and plaintiff in these cases.

H.R. 1362 (the "Crosser Bill" named for its sponsor, Robert Crosser) was introduced in January 1945. 92 Cong.Rec. 6,597 (1946). Hearings were held over three months generating 1,186 pages of testimony. *Id.* at 6,607. The Crosser Bill contained a provision to expand the coverage of the RRA to include freight forwarders and many corporations performing services incidental to transportation by rail, but as reported from the Committee on Interstate and Foreign Commerce (the "Committee Bill"), the expanding language was omitted. 92 Cong. Rec. 6,600, 6,608 (1946). The railroads opposed the Crosser Bill. *Hearings on H.R. 1362 Before the House Committee on Interstate and Foreign Commerce,* 79th Cong., 1st Sess. 427 (statement of J. Carter Fort on behalf of Association of American Railroads). As described by Rep. Bulwinkle, for Rep. Lea, Chairman of the Committee, the coverage of the 1946 law was to duplicate that of the 1937 Railway Labor Act from which it was copied. 92 Cong.Rec. 6,601 (1946). "The proposed amendment [*i.e.,* the Crosser Bill] would have the effect of bringing into the railroad retirement system the employees of any transfer company which happens to have a contract with a railroad to perform pickup and delivery service for it."

The reason for the expanded coverage was to discourage railroads from contracting out their work to independents and rail trucking subsidiaries. Such contracts for coordinated truck-rail service were precisely what the trucking exception originally aimed to foster. "No evidence whatever was offered to show that the railroads are engaged in the practice . . . to the extent that it is improper or undesirable." *Id.* (remarks of Rep. Bulwinkle). In order to justify the higher benefits paid to railroad employees compared with industry generally, the supporters of the Crosser Bill empha-

sized the safety value of having experienced railroad men on the roads, which good benefits would insure. *Id.* at 6,606.

On June 20, 1946, the Committee Bill was offered in lieu of the Crosser Bill, but was defeated. *Id.* at 7,252. Final consideration in the House was on July 3, 1946. The first item of consideration was the expanded coverage of the Crosser Bill. *Id.* at 8,260. Chairman Lea proposed an amendment to the Crosser Bill which would delete the coverage of trucking companies controlled by the railroads. *Id.* at 8,261. Rep. Crosser responded with a perfecting amendment changing the inclusory term "trucking service" to "transportation by motor vehicle." *Id.* Chairman Lea stated that the Crosser Bill, even with Rep. Crosser's amendment, would weaken the Railroad Retirement Fund by bringing in men who had not paid into the system. *Id.* at 8,262, 8,263. (The same criticism was voiced in 1979 of expanded coverage proposed by the IRS. *Employer Liability for Taxes Under the Railroad Retirement Tax Act: Hearing Before the House Subcommittee on Oversight of the Committee on Ways and Means,* 96th Cong., 1st Sess. 61, 112 (1979).)

The current law was thought in 1946 to exclude "truckers of all kinds from coverage under the railroad acts." 92 Cong.Rec. 8,263 (1946) (remarks of Rep. Wolverton). Rep. Crosser considered revising his amendment in order to include trucks used "incidentally and instead of the usual railroad equipment." *Id.* at 8,264. The parties disagreed as to whether railroad employees favored the broad scope of the bill. *Compare id.* at 8,262 *with id.* at 8,266. When put to a vote, the Crosser amendment was rejected, and the Lea restricted scope amendment was approved. *Id.* at 8,268.

The bill proceeded to the Senate. *Railroad Retirement: Hearings on S. 293 Before a Subcommittee of the Committee on Interstate Commerce,* 79th Cong., 1st Sess. (1946). Section 1 of the Senate bill would have included trucking companies owned or controlled by railroads, as well as all which provided services within the definition of

transportation in section 1(3) of the Interstate Commerce Act.[7] 92 Cong.Rec. 9,992 (1946). Both proponents and opponents of the expanded coverage conceded that these services were not subject to coverage under the existing language. An amendment was adopted striking all of section 1 of the bill, which left unchanged the coverage of the law. *Id.* at 10,005. The bill was passed by the Senate, *id.* at 10,171; the House concurred in the Senate amendments, *id.* at 10,321–22; and the President signed the measure into law. *Id.* at 10,636.[8]

█ The legislative history of the RRTA amply supports the conclusion that the trucking service exception was intended to comprehend rail-owned truck lines that engage in most of the activities common to MoTruck and TexTruck in 1973–76. Be-

cause Congress did not focus on the organizational, financial, and managerial relationship of truck lines and rails, the legislative history does not support the proposition that integration of truck and rail affiliates would convert a subsidiary truck line into a carrier. Although Congress in 1946 could not foresee the full implications of intermodality in the 1970's, this court cannot conform the statute as defendant requests. Judicial restraint is counseled, especially because Congress displayed its awareness of the fundamental rail-motor carrier intermodal operations and did not suggest that a rail-owned truck line would lose the exception should its trucking services change over time to maximize intermodal transport.[9]

---

**7.** Transportation services included receipt, storage, transfer in transit, ventilation, refrigeration or icing, storage and handling of property transported by any locomotive, vehicle or vessel, as well as instrumentalities and facilities of shipment or carriage.

**8.** In 1974 the RRA of 1937 was amended and replaced. Pub.L. No. 93–445, 88 Stat. 1305 (1974). The purpose of the bill, as in 1946, was to correct financing problems with the retirement system. *Railroad Retirement Act Restructuring: Report of the House Committee on Interstate and Foreign Commerce on H.R. 15301,* H.R.Rep. No. 93–1345, 93d Cong., 2d Sess. 1 (1974). The definition of employer, including the trucking service exception, was not changed. *Id.* at 17. The law prohibited the paying of dual benefits—one under the RRA and the other under Social Security—for services on or after 1975. *Id.* at 68. The 1974 bill was intended to retain the definition of the RRA of 1937, *id.* at 28, and once again, Congress forswore an opportunity to enact legislation addressing the concerns now argued by defendant.

**9.** The court recognizes that the IRS, at least since 1939, has interpreted the definition of "employer" in section 3231(a) to include a carrier or carrier subsidiary that performs significant non-casual services in connection with the transportation, receipt, transfer, storage, or handling of property by rail. In fact, acceding to the IRS view, MoTruck and TexTruck in 1951 and 1965, respectively, achieved tax exemptions based on representations that they no longer performed an express freight service and that their activities in connection with freight transportation were casual. *See supra* note 1.

Although an agency's interpretation of the statute under which it operates is entitled to some deference, "this deference is constrained by our obligation to honor the clear meaning of a statute as revealed by its language, purpose, and history. . . ." *Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979) (quoting *Teamsters v. Daniel,* 439 U.S. 551, 566 n. 20, 99 S.Ct. 790, 800 n. 20, 58 L.Ed.2d 808 (1979); *see Morton v. United States,* 708 F.2d 680 at 687 (Fed.Cir.1983) (NIES, J., dissenting). This long-standing agency interpretation, however, cannot prompt judicial deference.

First, the legislative history does not suggest that Congress viewed trucking services in harmony with the IRS, if defendant were to argue that Congress was aware of the IRS interpretation in 1946.

Second, the statute does not define trucking service as "casual service" or the "casual operation of equipment or facilities" in connection with rail freight movements. The reference to "trucking service" under defendant's reading would be surplusage if only casual service were excluded. Rather, the statute explicitly excepts three types of service: trucking service and casual service and casual operation of equipment or facilities. Trucking service is not casual service, although a trucking subsidiary performing casual service would be excluded from coverage. That Congress added "casual service" in 1937 further indicates that trucking service as enacted in 1934 was deemed not casual.

The qualifying term "casual," moreover, cannot be presumed gratuitous. The statute specifies "casual operation of equipment or facilities," but does not state "trucking service casual to rail freight operations" or "trucking ser-

The remaining arguments and case law advanced by defendant do not dictate a contrary result.

Due to the paucity of law on the section 3231(a) trucking exception, defendant relies on cases interpreting statutes with the same or similar provisions. *See Kokoszka v. Belford,* 417 U.S. 642, 651, 94 S.Ct. 2431, 2436, 41 L.Ed.2d 374 (1974). *Railroad Retirement Board v. Duquesne Warehouse Co.,* 326 U.S. 446, 66 S.Ct. 238, 90 L.Ed. 192 (1946), held that a railroad-owned warehouse which unloaded and stored goods moving by rail was an employer under the RRA and RUIA [10] because it performed a service in connection with transportation of property by railroad. 326 U.S. at 453–55, 66 S.Ct. at 241–42. The Court's inquiry was whether the service could be performed by the carrier and charged to the customer under rail line-haul tariffs. 326 U.S. at 454, 66 S.Ct. at 241. The trucking service exception was not discussed. *Duquesne* thus does not foreclose the possibility that services can be "in connection with . . . transportation . . . by railroad" and also be trucking. *See, e.g., Southern Development Co. v. Railroad Retirement Board,* 243 F.2d 351 (8th Cir.1957) (RRA and RUIA applied to a railroad subsidiary whose sole function was to lease to its parents and maintain an office building); *Universal Carloading & Distrib-uting Co. v. Pedrick,* 184 F.2d 64 (2d Cir. 1950) (RRTA applied to freight forwarder which was without a claim to the trucking service exception); *Despatch Shops, Inc. v. Railroad Retirement Board,* 154 F.2d 417 (2d Cir.1946) (RRA applied to a railroad's freight car manufacture and repair subsidiary); *Despatch Shops, Inc. v. Railroad Retirement Board,* 153 F.2d 644 (D.C.Cir. 1946) (RUIA applied to a railroad's freight car manufacture and repair subsidiary).

Following on the *Despatch* decisions, defendant argues that MoTruck and Tex-Truck repaired trailers; trailers and containers on flatcars do not lose their identity as boxcars once they are transferred to trucks; and, hence, the truck lines are employers under the companion provisions to section 3231(a) in the RRA and RUIA. The same reasoning compels the conclusion that truck trailers and containers do not lose their identity when loaded on flatcars. Indeed, the rail industry's acronym TOFC/COFC refers to trailers and containers on flatcars. The cited cases do not mandate that a service·in connection with railroad transportation cannot be simultaneously a trucking service. If this were not so, excepting trucking service from coverage as a rail or rail-related employer would not be necessary. *See supra* note 9.

vice except insofar as non-casual operations of equipment or facilities are involved."

Defendant also argues that plaintiff cannot qualify for the trucking service exception if any of its operations are rail. While MoTruck and TexTruck tested the tolerance of the exception by engaging in at least one purely rail function, cleaning up after train wrecks, the legislative history does not lend credence to defendant's taint argument. Almost all plaintiff's operations were truck or truck-rail activities.

Third, defendant's argument that MoTruck and TexTruck are carriers reads out the exception by making a subsidiary—once excepted as trucking service—covered because the subsidiary really is a carrier. The subsidiary is a carrier because it is integrated with the rail parent. Thus, an otherwise qualified subsidiary becomes disqualified if it is owned or controlled by a carrier to the extent that it merges with the carrier. Defendant poses a statutory quandary: If a truck line subsidiary performs casual service in aid of transportation of freight by rail, the trucking service exception is inap-plicable. If the service is too significant, the truck line forfeits its treatment as a subsidiary because the "rail" activities make it a carrier. The court does not adopt this unreasonable construction.

Finally, the provisio in section 3231(a) that an " 'employer' " "shall not exclude any part of the general steam-railroad system of transportation . . . .," does not include within the statute's coverage an excepted trucking service subsidiary that is a part of the rail system of transportation, nor does the provisio serve to make such a subsidiary a carrier in the first instance.

10. The RLA provision, 45 U.S.C. § 231(a)(1)(i), (ii) (1976), reads substantially the same as the language considered in *Duquesne* and is identical to the RRTA's trucking service exception in section 3231(a). The RUIA provision, 45 U.S.C. § 351(a) (1976), is identical to the RRTA on point, as it was when *Duquesne* was decided.

Defendant points out that the Railroad Retirement Board (the "RRB") consistently has rejected application of the trucking service exception to subsidiaries like MoTruck and TexTruck. The rulings are not consistent. *Compare New York Central Transport Co.,* RRB No. L. 61–13 (Jan. 9, 1961) (railroad subsidiary providing substitute truck-for-rail services and leasing of trailers to its parent held to be engaged in trucking service) *with Holston Land Co.,* RRB No. L. 74–10 (Jan. 11, 1974) (using tractors to unload trailers from flatcars not within exception). Moreover, these decisions irrevocably classify a trailer on a flatcar as a boxcar irrespective of its movement on a truck. *E.g., Santa Fe Terminal Services, Inc.,* RRB No. L. 74–14 (Jan. 16, 1974); *Holston Land Co.,* RRB No. L. 74–10; *Excelsior Truck Leasing Co.,* RRB No. L. 70–29 (Feb. 9, 1970); *REA Leasing Corp.,* RRB No. L. 67–51 (Feb. 24, 1967). This interpretation is inconsistent with a " 'construction that will carry into execution the will of the Legislature....' ", *Kokoszka v. Belford,* 417 U.S. at 650, 94 S.Ct. at 2436 (quoting *Brown v. Duchesne,* 19 How. 183, 194, 15 L.Ed. 595 (1857)); *see supra* note 9, in enacting the trucking service exception. *Florida East Coast Ry.,* RRB No. L. 79–76 (Feb. 28, 1979), involved companies performing many and varied railroad activities with only tangential relation to trucking. At issue in *Excelsior Truck Leasing Co.,* RRB No. L. 70–29.1 (July 30, 1970), was the busing and leasing of cars to transport railroad employees and equipment, not the transporting of freight by railroad.

The decision primarily relied upon by the RRB for the proposition that operation of trailers is railroading is *Movement of Highway Trailers by Rail,* 293 I.C.C. 93 (1954). The ICC held that while on a flatcar the movement of a trailer is carriage by railroad, but it did not address movement of the trailer on a truck. 293 I.C.C. at 101. Thus, the RRB has extended the holding of *Trailers by Rail* to situations beyond the rail portion of carriage.

The one court decision on point is unreported. *Southern Ry. v. Combs,* C.A. No. 8763 (S.D.Ohio Apr. 9, 1973). The question in *Combs* was whether Central of Georgia Motor Transport Co. ("Central"), completely owned by Southern Railway, was a carrier under the RLA, so as to confer the National Mediation Board ("NMB") with jurisdiction over labor disputes. The court held that the RLA term "carrier" includes a great many operations, but not a company owned or controlled by a railroad that performs "trucking service." Slip op. at 4. On appeal the decision was vacated because the NMB should have been allowed to make the initial determination of Central's status. *Southern Ry. v. Combs,* 484 F.2d 145, 150 (6th Cir.1973). The NMB then held that Central's Interstate Commerce Act Part 2 certification was dispositive that Central was not a carrier by rail. *Truck Drivers, Chauffeurs & Helpers Local Union No. 100,* 5 N.M.B. 298 (1975).

To rebut plaintiff's contention that a contractor can perform services regulated as a railroad under Part 1 of the Interstate Commerce Act without becoming a carrier by railroad, defendant cites *Cederblade v. Parmelee Transportation Co.,* 166 F.2d 554 (7th Cir.1948). Plaintiffs, bus and truck drivers who transported property within a rail terminal area, sought overtime compensation under the Fair Labor Standards Act. Defendant resisted paying the overtime on the basis of an exception for employers regulated under Part 1 of the Interstate Commerce Act. The court held that "such transportation was railroad transportation ...." and applied the exception. 166 F.2d at 556. However, it is not clear whether the court concluded that the services were railroading or that Parmelee was a railroad. The ICC soon addressed the same facts in *Cederblade* in *Status of Parmelee Transportation Co.,* 288 I.C.C. 95 (1953), ruling that the services were regulated under Part 1 of the Interstate Commerce Act as if performed by the railroad itself, but that Parmelee was "not a carrier as defined in Part 1 of the Act." 288 I.C.C. at 104. *Cederblade* implicitly was rejected by the ICC, as demonstrated by the dissent's reliance on *Cederblade* as authority for holding Parme-

lee a Part 1 carrier. 288 I.C.C. at 105 (dissenting op.).

For the proposition that a company can be a railroad carrier even if it does not hold itself out as a railroad, defendant relies on *United States v. Union Stock Yard & Transit Co.,* 226 U.S. 286, 33 S.Ct. 83, 57 L.Ed.2d 226 (1912). A company was organized which built a stockyard for the delivery and transfer of livestock and also constructed a system of rails and switches to connect the stockyard with the various trunk line railroads emanating from Chicago. In a move apparently designed to avoid ICC regulation, the stockyard leased its railroad equipment and lines to another subsidiary of the stockyard's parent. The United States sought to regulate the stockyard under the Interstate Commerce Act. The Supreme Court agreed, holding that the stockyard was a railroad and that its services were transportation. 226 U.S. at 306, 33 S.Ct. at 88. Although *Union Stock Yard,* decided before the trucking service exception was enacted, reveals that a railroad carrier comprehends more than trains or tracks, trucking operations were not discussed.

*New York Dock Ry. v. Pennsylvania R.R.,* 62 F.2d 1010 (3d Cir.), *cert. denied,* 289 U.S. 750, 53 S.Ct. 694, 77 L.Ed. 1495 (1933), does not advance defendant's case. The court rejected a challenge to a railroad's supplying pickup and delivery service by truck at its New York terminals—manifestly undertaken to enable the railroad to compete with the door-to-door service of trucking companies—by holding that the proposed activity was a service of transportation, but was not a railroad, a line of railroads, or an extension of a line of railroads within the meaning of the Interstate Commerce Act. 62 F.2d at 1014.

Defendant also argues that the integrated enterprise doctrine should be applied to the RRTA. This doctrine, recognized by the NLRB, holds parents liable for their subsidiaries' labor practices. *See Sakrete of Northern California, Inc. v. NLRB,* 332 F.2d 902 (9th Cir.1964), *cert. denied,* 379 U.S. 961,

85 S.Ct. 649, 13 L.Ed.2d 556 (1965). Because no case applies the doctrine under the RRTA, defendant relies on *Delpro Co. v. Brotherhood Ry. Carmen United States and Canada, AFL–CIO,* 676 F.2d 960 (3d Cir. 1982), to indicate that the NMB has adopted, and the courts have approved, application of the integrated enterprise doctrine in other contexts. In *Delpro* a union sought the NMB's intervention in a dispute over the representation of employees at Delpro. To exercise jurisdiction, the NMB had to find that Delpro was a carrier under the RLA. It did, and the Third Circuit affirmed the district court's approval of the NMB's action. The truck lines in this case and Delpro were subsidiaries of acknowledged railroad carriers; they had some identity of management personnel between parents and subsidiaries; and they performed service in connection with railroad transportation. *Delpro,* however, does not require application of the doctrine here, because the integrated enterprise doctrine does not surface in *Delpro.* The court analyzed the "or" in "owned or controlled by ... any carrier by railroad" against a pair of NMB decisions which Delpro contended should cause the "or" to be read as "and." 676 F.2d at 964. The court declined to read "or" as "and"; therefore, its inquiry ended when it found that Delpro was owned by a railroad carrier. Unlike MoTruck and Tex-Truck, Delpro did not perform trucking services. While Delpro repaired flatcars—which have only the single function of running over rails—it did not deal with, as the truck lines do, trailers and containers—which have the dual function of running on flatcars over rails and on trucks in highway transport.

Based on the foregoing representative authorities, the court declines to read the trucking exception out of the RRTA by holding that the trucking subsidiaries are carriers or do not perform trucking service whether due to their economic and functional relationship to their rail parents or to their rail-related activities.[11]

11. Because of the determination that plaintiff is not liable for RRTA taxes under 26 U.S.C.

§ 3231(a), the alternative arguments against liability are not considered, *i.e.,* 26 U.S.C. § 3401

CONCLUSION

MoTruck and TexTruck were not employers within section 3231(a) of the RRTA during 1973–76.

Defendant's counterclaims shall be dismissed. The parties are directed to inform the court by August 12, 1983, as to any further proceedings that will be required in order to determine the amount of judgment.

note (Supp. V 1981) (plaintiff had a reasonable basis for not treating its employees under RRTA); 26 U.S.C. § 6501(a) (assessments from Jan. 1, 1971, through June 30, 1975, are barred by the statute of limitations); 26 U.S.C. § 7805(b) (retroactive application of the IRS rulings is an abuse of discretion); and 26 U.S.C. § 6205(a)(1) (assessments improperly include preassessment interest).